GEORGINA LUISA LOKPEZ FINLAY, demandante, contrademandada y apelada, *v.* VÍCTOR LUIS LOKPEZ y AMELIA PALMIERI VDA. DE WOODS, hoy su Sucesión, demandados, contrademandante y apelante la última.

Núm. 8520.—*Sometido:* Noviembre 17, 1942. *Resuelto:* Marzo 25, 1943.

*Damián Monserrat, Jr., Gabriel de la Haba* y *Rafael Baragaño*, abogados de la apelante; *Mariano Acosta Velarde, Federico Acosta Velarde* y *Daniel Pellón, Jr.*, abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

Georgina Luisa Lokpez Finlay fué emancipada por su padre Víctor Lokpez por escritura pública otorgada ante el Notario Rafael A. Saliva, de Mayagüez, el día 25 de julio de 1935 y en la misma fecha y ante el mismo notario ella otorgó otra escritura concediendo poder general a favor de su mencionado padre autorizándole, entre otras cosas: " . . . . . para que en nombre y representación de la otorgante venda y enajene toda clase de bienes inmuebles, muebles, y semovientes pertenecientes a la otorgante, y toda clase de derechos reales y personales de la otorgante; para que las enajenaciones y ventas que haga las otorgue por escritura pública con las condiciones y pactos que estime el apo-

derado; para que adquiera para la otorgante toda clase de bienes inmuebles, muebles, y semovientes, derechos reales y personales, por precio y condiciones que estime; *para que celebre toda clase de contratos, de hipoteca, subhipoteca, y permuta de toda clase de bienes inmuebles, muebles,* semovientes, derechos reales, y personales de la otorgante, parcial o totalmente, así como las subhipotecas; . . ." " . . . *y firme pagarés, cheques y toda clase de documentos en representación de la otorgante;"* (Bastardillas nuestras.)

A virtud de dicho poder Víctor Lokpez el 22 de mayo de 1937 tomó a préstamo de la señora Amelia Palmieri Vda. de Woods la suma de $6,000 y otorgó una escritura para garantizar dicha deuda hipotecando una finca de su hija. El día 13 de julio de 1938 la demandante revocó el poder que había concedido a su padre y presentó poco después esta acción en la corte inferior solicitando la nulidad de la escritura de hipoteca alegando, entre otros motivos, que su padre no ejercía la patria potestad sobre ella y no podía emanciparla; que asumiendo que su emancipación fuera válida, el poder concedido a su padre no lo autorizaba para tomar dinero a préstamo. Los demandados negaron estos hechos y como defensa principal alegaron que la demandante en todo caso había ratificado el contrato otorgado y se había beneficiado con el importe del préstamo, solicitando la codemandada, Sucesión de doña Amelia Palmieri, que de prosperar la acción de nulidad se condenara a la demandante a devolver dicha suma.

La corte inferior declaró con lugar la demanda y la sucesión demandada apeló de la sentencia y en este recurso alega que cometió error, 1, al declarar que el mandatario carecía de facultades para realizar los actos que impugna la demandante y en su consecuencia que no podía tomar dinero a préstamo y otorgar el contrato de hipoteca; 2, al declarar que la prueba ofrecida por medio de los testigos Nathaniel Passarell, y María Amelia Pasarell, tendientes a probar la ratificación del contrato de hipoteca era impertinente; 3, al

declarar que no hubo dicha ratificación, y 4, al declarar que el contrato de hipoteca es nulo e inexistente.

Como todas las cuestiones referentes al estatuto personal de la demandante apelada, al ejercicio de la patria potestad de su padre sobre ella, a su emancipación y al otorgamiento del poder, fueron resueltas por la corte inferior a favor de los demandados, la recurrente, como es natural, se abstuvo de discutir dichas cuestiones en su alegato por no ser objeto de este recurso. Esto no obstante, la demandante apelada en el suyo después de refutar los errores antes mencionados las discute ampliamente por cuyo motivo los apelantes radicaron un alegato de réplica sosteniendo la conclusión a que llegó la corte inferior. Somos de opinión que estas cuestiones fueron correctamente resueltas por dicha corte. Véase al efecto nuestra decisión en el caso de *Lokpez* v. *Fernández*, resuelto en marzo 10, 1943, ante, pág. 522.

Pasamos a considerar y resolver los errores alegados en el presente recurso.

■■ El primero envuelve la determinación de si el poder otorgado por la demandante a su padre incluía la facultad para tomar dinero a préstamo a nombre de la demandante y garantizar la deuda contraída con hipoteca.

De una mera lectura de la parte pertinente del poder anteriormente transcrita se verá que a pesar de ser el mismo uno de carácter general no contiene autorización expresa alguna para tomar dinero a préstamo. Desde el año 1909 este tribunal ha resuelto consistentemente que los mandatos deben ser interpretados en forma restrictiva siguiendo así la doctrina establecida por el Tribunal Supremo de España y la interpretación de los comentaristas del Código Civil. Comenzando con el caso de *Fano* v. *Registrador,* 15 D.P.R. 334, resuelto en dicho año, y terminando con el de *Font* v. *Registrador,* 57 D.P.R. 648, resuelto en el año 1940, la doctrina de la interpretación estricta ha sido ratificada en muchas decisiones de las cuales se citan algunas en el caso de Font, su-

pra. Directamente aplicable al caso de autos es la decisión en el de *Villar* v. *Registrador*, 17 D.P.R. 434, ratificada en *Iturrondo* v. *Registrador*, 17 D.P.R. 437, y *Llull* v. *Registrador*, 20 D.P.R. 440.

En el caso de *Villar*, supra, se resolvió que la facultad de tomar dinero a préstamo tiene que ser concedida expresamente por el mandante, aún cuando el poder allí interpretado concedía la facultad para hipotecar y vender. Esta Corte, por voz de su entonces Juez Asociado Sr. Del Toro, se expresó en esta forma:

"La facultad para tomar dinero a préstamo no aparece conferida expresamente, pero el recurrente alega que lo fué de una manera implícita, ya que el poderdante, no sólo faculta a su apoderado para hipotecar todos sus bienes, derechos, créditos y acciones, sino también para venderlos, permutarlos y cederlos.

"Si la interpretación que se diera a los mandatos, fuera amplia y liberal, tal vez tendría razón el recurrente; pero como de acuerdo con la ley natural, la equidad, la jurisprudencia y el mismo Código Civil, deben ser interpretados en sentido restrictivo, la razón en este caso está de parte del registrador.

"*   *   *   *   *   *   *

"El tomar dinero a préstamo es un asunto serio y una persona puede estar perfectamente dispuesta a dar a su apoderado facultad para vender o hipotecar con objeto de pagar deudas existentes, etc., y no querer facultarle para contraer préstamos. Las facultades de los apoderados deben ser claras y precisas y la de tomar dinero a préstamo, si se confiere, debe hacerse constar expresamente en el documento público que al efecto se otorgue."

Es cierto que tanto en este caso como en el de *Iturrondo*, supra, hubo dos votos disidentes, pero en el de *Llull* v. *Registrador*, supra, se aprobó la doctrina del caso de *Villar* y los dos jueces que habían disentido anteriormente se unieron a la mayoría, siendo ponente uno de ellos, el Juez Asociado Sr. Wolf, quien a nombre del tribunal se expresó así:

'Aun en el supuesto de que los términos en que está redactada dicha cláusula cuarta tengan únicamente aplicación a un préstamo contraído por el mandatario, como así sostiene el recurrente, debe

prevalecer la doctrina sentada en el recurso gubernativo de *Villar* v. *El Registrador,* 17 D.P.R. 434, al efecto de que a menos que expresamente se faculte, el poder para hipotecar no implica facultad para tomar dinero a préstamo, pero de cualquier modo siendo ambigua la cláusula cuarta ya mencionada, la nota del registrador debe confirmarse.''

Arguyen los apelantes que en el caso de *Diez* v. *Green et al.,* 32 D.P.R. 814, 816, esta corte modificó la doctrina del caso de Villar, supra, ''estableciendo que cuando se confiere la facultad de hipotecar y la de expedir pagarés, puede tomarse dinero a préstamo''. No tienen razón los apelantes, pues lo resuelto en el caso de *Diez* v. *Green,* supra, no tiene el alcance que ellos quieren darle. Lo que se sostuvo por esta corte fué que al haberle concedido Diez a su mandatario Pérez poder para suscribir pagarés se le había autorizado a reconocer una deuda ya contraída por su mandante y que por tanto no era nula una hipoteca constituída por Pérez a favor de Green para garantizarle dicha deuda. Después de hacer referencia a las facultades contenidas en el poder, esta Corte dijo:

''Las mencionadas facultades conferidas al apoderado demuestran por sí mismas que don Antonio Diez no sólo confirió a José B. Pérez un poder amplio y general para actuar en su nombre sino que expresamente le confirió facultad para otorgar hipotecas, para otorgar en documentos públicos los contratos que realice y para suscribir pagarés, que son documentos en que se reconocen deudas, por lo que no podemos declarar que sea nula la escritura de primero de junio de 1914 en la que el apoderado constituye hipoteca sobre una finca de su mandante para responder a Green del pago de los $5,000 que reconoció estar adeudándole su mandante.''

Si el apoderado en el caso de autos se hubiera limitado a reconocer la existencia de una deuda contraída por su mandante, sería aplicable la doctrina del caso de *Diez* v. *Green,* supra, ya que el poder concedido en ambos casos facultaba al apoderado para hipotecar bienes de su mandante y firmar pagarés. Pero el contrato aquí celebrado por el apoderado fué completamente distinto, es decir, tomó dinero

a préstamo en nombre de su mandante sin que existiera deuda alguna, y por tanto, es inaplicable la doctrina del caso antes mencionado.

También citan los apelantes el caso de *Dapena* v. *Sucesión Dominicci*, 12 D.P.R. 66. Tienen razón al argüir que dicho caso está en contradicción con la doctrina anteriormente expuesta y sostiene su posición. A pesar de que en el poder sólo se concedía autorización para administrar, dirigir y gobernar los bienes del mandante, esta Corte por voz del Juez Asociado Sr. MacLeary resolvió lo siguiente:

"Aunque el pedir dinero prestado y el otorgamiento de un pagaré para garantía de la cantidad prestada o la compra de efectos y el contraer deudas y arreglo de las mismas por medio de un pagaré no se han mencionado de un modo especial, sin embargo, el poder para hacerlo está necesariamente comprendido en la dirección y administración general de las propiedades, y el apoderado, de acuerdo con la autoridad conferídale podía contraer la deuda y otorgar el pagaré. Creemos suficiente el poder para facultar al apoderado a otorgar, ejecutar y entregar el pagaré objeto del presente litigio."

La opinión no contiene cita alguna de autoridades para sostener la conclusión a que se llegó. Aparentemente se aplicó la excepción a la regla general que prevalece en el Derecho Común al efecto de que puede hacerlo ". . . cuando el carácter del negocio o las obligaciones del agente son de tal naturaleza que sea razonablemente necesario que él tome o dé dinero a préstamo para llevar a cabo sus instrucciones y los deberes de su cargo, . . ." 2 C.J.S., *Agency,* sección 110. Decimos que ésta es la excepción porque la regla general en los Estados Unidos es igual a la nuestra. Como se dijo en el caso de *Williams* v. *Dugan*, 105 N. E. 615, 217 Mass. 526:

"La autoridad para tomar dinero a préstamo o para expedir y entregar pagarés es una de las más importantes que un principal puede conferir a un agente. Conlleva grandes probabilidades de calamidad económica. No debe ser implicada a la ligera. Debe ser concedida en forma expresa o surgir como una consecuencia necesaria e inevitable de la naturaleza del mandato concedido."

En el *Restatement* sobre *Agency,* sección 74, se expresa la regla diciéndose: "A menos que se haya acordado en otra forma, un agente no tiene autoridad para tomar a préstamo a menos que sea usualmente incidental al cumplimiento de actos que esté autorizado a realizar para el principal."

El caso de *Dapena* v. *Dominicci* fué resuelto con anterioridad a los de *Villar* v. *Registrador; Iturrondo* v. *Registrador* y *Llull* v. *Registrador,* ratificados en el de *Font* v. *Registrador,* supra, y en tanto en cuanto esté en conflicto con la regla de interpretación estricta del mandato en éstos establecida, debe considerarse revocado.

Por último sostienen los apelantes que si el poder no concedió autoridad a Lokpez para tomar dinero a préstamo, la demandante sí le autorizó para hacerlo en varias cartas que escribió a su padre después de otorgado el poder. Hemos leído detenida y repetidamente dichas cartas (*Exhibit* "J" demandados) y coincidimos con el análisis y alcance que la corte inferior da a las mismas en su opinión cuando dice:

". . . . En ninguna de las referidas cartas se autoriza al Sr. Lokpez para tomar dinero a préstamo. En la primera, que tiene fecha febrero 19 de 1937, le dice la demandante a su padre, entre otras cosas: 'En primer lugar, los $10,000 que tú me envíes va a estar a mi nombre.' 'Empieza a preparar dinero para la cuestión del divorcio aquí pues tengo que darle anticipadamente a los abogados algo.' 'Necesitaría me enviaras cosa de $500.' 'Si tú enseguida que encontraras los $10,000 te vinieras conmigo sería encantador.' 'Recibí los $300 como te decía en mi anterior y le envié $200.'

"La segunda carta, fechada febrero 23 de 1937, contiene las siguientes frases: 'Quiero preguntarte como cuánto tardarás en conseguirme el dinero.' 'Tú sabes la mayoría de lo que me mandes se lo envío a Pedrito.' 'Trata de girarme papi lo más pronto que puedas alrededor de $500, esta vez no le enviaré a él.' 'Acuérdate pues tan pronto recibas ésta gírame lo que consigas.'

"La tercera, de fecha febrero 26 de 1937, dice lo siguiente: 'Yo te pedí dinero para los abogados de aquí.' 'Tú me mandas dinero por parte el cual se hace agua por la sencilla razón de que aquél

por allá y yo por acá tenemos que tener dinero.' 'De lo del negocio te diré cuando tenga el dinero y se vaya a poner.'

"Y en la última, fechada marzo 4, 1937, le dice la demandante a su padre: 'Te acabo de poner otro cable pidiéndote más dinero.' 'Si me hubieras enviado los $10,000 ya todo estaría muy adelantado y me iría y con $8,000 a poner allá un negocio, pero yo confío en tí y espero me los mandes pronto para que Pedrito empiece a trabajar.' 'Te suplico hagas los esfuerzos necesarios para enviarme ese dinero para empezar a trabajar.'

"Hemos analizado y leído con cuidado todas y cada una de las referidas cartas, y después de ello quedamos convencidos de que en las mismas no se hace referencia a préstamo alguno. Todas ellas son cartas dirigidas a un padre por una hija criada como rica, complacida en todos sus caprichos y nunca contrariada, cómo lo comprueban las mismas, de las que aparece que el padre consentía y permitía que su hija gestionase el divorcio del que hoy es su esposo, pagando los abogados y dándole dinero a la entonces esposa del mismo, e iba a conseguirle a su hija la suma de $10,000 para que el esposo de la misma estableciese un negocio. No hay evidencia de que las referidas cartas le hubiesen sido mostradas a la demandada Sra. Vda. de Woods a los fines de obtener de la misma el préstamo.

"El exhibit 8 de la demandante, que lo es un estado de cuenta, corrobora nuestra conclusión de lo consentida que estaba la demandante. Demuestra dicho estado de cuenta, que desde enero 18 del año 1937 hasta mayo 20 de dicho año, dos días antes de hacerse el préstamo, el Sr. Lokpez había entregado a su hija, la demandante, $4,160, más de $1,000 mensuales.''

La petición que la demandante le hacía a su padre para que le enviara $10,000 para establecer un negocio y pagar los gastos del divorcio de su futuro esposo, no puede interpretarse implícitamente como una autorización al padre para tomar dicha suma a préstamo. Dicha petición es compatible con la facultad que ya tenía el padre de la demandante para vender cualquier propiedad de ésta, como en efecto lo hizo según demuestra el exhibit 7 de la demandante en el que se detallan los bienes vendidos, a virtud del poder, por una suma total de $47,074.11. De este total corresponde a solares vendidos desde el 26 de febrero al 11 de mayo de 1937, o sea antes de la hipoteca de este caso otorgada en 22 de

mayo, la suma de $5,816.60. No puede por implicación sostenerse que el padre de la demandante fué autorizado a tomar a préstamo los $6,000 cuando los hechos probados demuestran que estaba utilizando el poder expreso concedídole para vender. No se cometió el primer error.

El segundo y tercero pueden discutirse y resolverse conjuntamente, pues se refieren a la no admisión por la corte inferior de cierta prueba ofrecida por los demandados para sostener su defensa de que el contrato de préstamo e hipoteca fué ratificado por la demandante, y al resolver que no hubo tal ratificación.

En el hecho sexto de la materia nueva de defensa en su contestación los demandados alegaron ''Que la demandante ha ratificado tanto la escritura de hipoteca objeto de impugnación en la demanda, como todos los contratos verificados por su padre en virtud de dicha emancipación y poder general por actos posteriores a dicha emancipación y otorgamiento de poder general. . . . '' En relación con este hecho la demandante solicitó y obtuvo que los demandados radicaran un *bill* de particulares el que en parte, dice así:

''La demandante ha ratificado tanto la escritura de hipoteca como todos los demás actos realizados por su padre:

''(a) Al solicitar de la demandada, por conducto del abogado que suscribe y del hijo de la demandada Nathaniel Pasarell, el levantamiento y cancelación parcial de dicha hipoteca, en cuanto a un solar que formaba parte de la finca hipotecada para venderlo a una tercera persona libre de dicho gravamen.''

¿Se probó la ratificación? Los demandados trataron insistentemente de presentar prueba al efecto mediante las declaraciones de Nathaniel Pasarell y María Amelia Pasarell. La demandante se opuso y la corte denegó su admisión, anotando los demandados excepción.

Son dos los incidentes que aparecen en la transcripción de la evidencia en relación con esta prueba. El primero al estar declarando el testigo Nathaniel Pasarell, hijo de doña Amelia Palmieri, la primitiva acreedora hipotecaria. Se le

preguntó: "¿Qué ofrecimientos de pago, si algunos, se le hicieron a doña Amelia Palmieri por conducto suyo en relación con este préstamo hipotecario?" Surgió entonces un largo incidente al oponerse el abogado de la demandante a la pregunta por el hecho de que habiendo aclarado el abogado de los demandados que las gestiones las había realizado el esposo de la demandante, "ya la propia demandante ha declarado aquí que ella nunca dió mandato a nadie" y siendo los bienes privativos de la demandante las actuaciones de su esposo no podían obligarla. La argumentación de los demandados fué al efecto de que siendo el marido el administrador de la sociedad de gananciales y de cargo de ésta, de acuerdo con el artículo 1308 del Código Civil, "los atrasos o réditos devengados durante el matrimonio, de las obligaciones a que estuvieren afectos así los bienes propios de los cónyuges como los gananciales", era admisible la prueba para demostrar las gestiones que el Sr. Rovira, esposo de la demandante, había realizado a nombre de ésta para pagar los intereses de la hipoteca y para obtener el consentimiento de la acreedora para vender los solares hipotecados liberándolos del gravamen y percibiendo la acreedora una tercera parte del precio de la venta.

Somos de opinión que la corte inferior cometió error al no admitir esta prueba de los demandados especialmente si tomamos en consideración las declaraciones de la demandante, la de su esposo y la del cobrador, Sr. Peña.

La demandante, anticipándose a rebatir la defensa de los demandados, trató de desvirtuar toda actuación de su parte que pudiera implicar la ratificación del préstamo. Tanto ella como su esposo negaron que éste o el cobrador Sr. Peña tuvieran autorización de la demandante para pagar los intereses que Peña satisfizo a nombre de ella a la acreedora en el mes de mayo de 1938 y también negaron que la demandante hubiera autorizado a su esposo a gestionar la venta de solares sujetos a la hipoteca con el consentimiento de la

acreedora. Empero, todas estas negaciones pierden su eficacia al confrontarlas con las actuaciones de la demandante y de su esposo según sus propias declaraciones corroboradas por la de Peña.

Declaró la demandante que en el mes de mayo de 1938 ella se hizo cargo de sus bienes y que Peña, que había sido nombrado por su padre, continuó como cobrador. Que desde dicho mes de mayo Peña le liquidaba sus cuentas a su esposo; que ella no recuerda la cantidad que le entregaba; que ya ella sabía de la hipoteca; que su esposo subió los cánones de arrendamiento por su propia cuenta sin autorización suya; que su esposo pagaba las contribuciones y también iba donde Peña a coger el dinero de las rentas y luego se lo daba a ella; *que ella no intervenía en nada en la administración de sus propiedades;* que su esposo cobraba, *"pero cosas de escritura que se vendía,* (ella) *tenía que firmar";* que cuando se iban a vender solares el interesado discutía el precio con ella y con su esposo. Específicamente negó la demandante que ella o su esposo hicieran gestiones para vender los solares hipotecados a doña Amelia, ni autorizó a su esposo para hacer gestiones de venta.

El Sr. Rovira, esposo de la demandante, declaró que él recibía el dinero producto de las rentas de su esposa; que supo que el cobrador Peña había pagado los intereses de la hipoteca correspondientes al mes de mayo, 1938, y le dijo que no debió haber hecho tal pago y que en lo sucesivo se abstuviera de hacerlo; *que no le dijo nada a su esposa de ese pago;* que Peña cobró alrededor de $400 en mayo y en la deducción de su comisión y los $40 de los intereses quedaron unos $320 y le entregó parte a su esposa y *se quedó con parte* y le dijo: "aquí tienes lo que se ha cobrado de las rentas este mes. *Esto es lo que ha sobrado";* que ella no le pidió explicación y él no le dijo del pago de los intereses; que él no tenía autorización de su esposa pero que "ése es un interés que se toma un esposo por los intereses

de su señora''; que ella tenía plena confianza en él y la sigue teniendo pues él es *''el llamado a dar el frente en esas cosas''*. (Bastardillas nuestras.)

Aparentemente extrañado de lo dicho por el Sr. Rovira el juez sentenciador le preguntó: ''Y no obstante toda esa protesta que hizo al señor Peña, no le comunicó a su esposa nada de lo ocurrido?'' contestando en la negativa el testigo porque ella no sabía que hubiese nada de eso y porque como eso estaba bajo estudio le dijo que no pagara los intereses.

Peña corroboró plenamente las declaraciones de la demandante y su esposo al efecto de que era el Sr. Rovira quien se entendía mensualmente con él en la liquidación de las rentas de la demandante; que él pagó los intereses del mes de mayo a la señora Palmieri, y Rovira le dijo que no debió haberlo hecho; que él nunca se entendió directamente con la demandante; que Rovira le aumentó el canon a los inquilinos; que cuando la demandante y Rovira se fueron a New York él le enviaba el dinero por giro a Rovira.

De toda esta prueba surge el hecho de que el administrador de los bienes privativos de la demandante lo era su esposo el Sr. Rovira. Es cierto que tanto ella como él dijeron que él no tenía poder concedido por ella. Empero, ¿qué valor pueden tener estas palabras ante las actuaciones del propio Rovira admitidas como ciertas tanto por la demandante como por él y corroboradas por Peña? De hecho se probó que aunque la demandante no hubiera otorgado un poder expreso a su esposo para *vender* sus propiedades, sí le encomendó la administración de sus bienes privativos incluyendo las gestiones para la venta de solares aunque ''para cosas de escritura ella tenía que firmar''. Era él quien recibía las rentas y le entregaba parte a la demandante y se quedaba con otra parte; era él quien fijaba los cánones de arrendadamiento y quien pagaba las contribuciones y con quien se entendía el cobrador Peña, todo ello con la aquiescencia de la demandante. Si todo esto se probó a través de la prueba de la demandante, ¿bajo qué teoría legal puede sostenerse

que la prueba de los demandados que tendía a demostrar otras actuaciones de Rovira en representación de su esposa, no era admisible? No decimos ni resolvemos cuál pudo ser el alcance o el crédito que esa prueba debió tener o merecer en la mente del juzgador, pero sí resolvemos que era claramente admisible para contradecir la prueba de la demandante tendiente a negar la autoridad con que actuaba su esposo y para sostener la defensa de ratificación alegada por los demandados. Si para la venta de los bienes inmuebles privativos de la demandante necesitaba Rovira poder expreso de su esposa, para realizar las gestiones de venta, pagar intereses y otros actos similares de administración bastaba con el que tácitamente se probó que le había conferido. Artículos 1601 a 1604 del Código Civil. Si la realización de estas gestiones con el conocimiento y aprobación de la demandante tuvo como efecto la ratificación por su parte del contrato de préstamo, es cuestión que sólo podría resolverse después de conocer la prueba que no fué admitida, teniendo en cuenta el artículo 1618 del Código Civil especialmente en su segundo párrafo preceptivo de que ''En lo que el mandatario se haya excedido no queda obligado el mandante sino cuando lo ratifica *expresa o tácitamente.''* (Bastardillas nuestras.)

Comentando Manresa el segundo párrafo del artículo 1727 del Código Civil de España, equivalente al 1618 del nuestro, dice en el volumen 11, páginas 536, 37 de su obra:

''. . . Baste consignar que el precepto legal satisface en este punto las normas de la justicia más estricta, y que, además, en la evolución histórica y legal, fué siempre la *ratihabitio* considerada como facultad inherente del poderdante. *La ratificación expresa y tácita, por lo que atañe a sus efectos, están en la ley justamente equiparadas,* porque no significa otra cosa sino la prestación del consentimiento y las manifestaciones de la voluntad, *ora por la palabra, verbo del pensamiento, ora por los actos derivados de la deliberación de éste y del querer de aquélla.''* (Bastardillas nuestras.)

Equiparadas en sus efectos la ratificación expresa y tácita, corresponde a quien la alega probarla y habiéndose an-

ticipado la demandante por su prueba en tratar de negar dicha ratificación, erró la corte inferior al no admitir la prueba de los demandados que era esencial para poder resolver con acierto si hubo o no la ratificación, especialmente tácita. Habiendo demostrado la prueba de la demandante ciertos actos realizados por el Sr. Rovira es de aplicación la última parte del artículo 385 del Código de Enjuiciamiento Civil (Artículo 23, Ley de Evidencia) al efecto de que: " . . . cuando un acto, declaración, conversación o escrito aislado, se presentare como evidencia, podrá también presentarse como tal cualquier *otro* acto, declaración, conversación o escrito, que fuere necesario para su conocimiento total."

La situación que presenta el caso de autos es una que requería la determinación de dos cuestiones, 1, si la demandante concedió poder tácito a su esposo para administrar sus bienes privativos, y 2, si el esposo al actuar como mandatario de su esposa ratificó, con el conocimiento y consentimiento expreso o tácito de la demandante el préstamo de que era deudora a los demandados. En cuanto a la primera cuestión ya hemos resuelto que la propia prueba de la demandante demostró que ésta concedió dicho poder a su esposo. La segunda cuestión no podemos resolverla por no tener ante nos la prueba que fué rechazada por la corte inferior. No se trataba de probar por los demandados, como erróneamente fué enfocada esta cuestión, actuaciones del Sr. Rovira como administrador de la sociedad de gananciales, sino sus actuaciones como administrador de los bienes privativos de la demandante, hecho que, según hemos dicho, quedó plenamente demostrado.

Somos de opinión que el segundo error fué cometido y que el mismo conlleva la revocación de la sentencia.

*Se declara con lugar el recurso, se revoca la sentencia apelada, debiendo devolverse el caso a la corte inferior para ulteriores procedimientos no inconsistentes con esta opinión.*

EN MOCIÓN DE RECONSIDERACIÓN

RESOLUCION

Abril 27, 1943.

Por la Corte, a propuesta del Juez Asociado Sr. Todd, Jr.

Vista la moción de reconsideración presentada por la apelada fundada, primero, en la inaplicabilidad a los hechos de este caso de la doctrina del domicilio; segundo, que de aplicarse, la demandante era menor de edad a la fecha de los supuestos actos de ratificación y estando ella domiciliada en New York no pudo ratificarlos; tercero, que el error de no admitir la prueba tendente a probar la ratificación no es perjudicial porque la demandante, por ser menor de edad, no podía ratificar el contrato de hipoteca sin el consentimiento paterno y, cuarto, porque dicho contrato por ser nulo en el sentido de inexistente no era confirmable.

POR CUANTO el primer fundamento, como dijimos en nuestra opinión original, no fué objeto de un señalamiento de error en este recurso, y sólo hicimos referencia a lo resuelto en el caso de *Lokpez* v. *Fernández,* ante pág. 522;

POR CUANTO no estamos en condiciones de resolver los fundamentos segundo, tercero y cuarto, pues la prueba no admitida en cuanto a la declaración del Sr. Nathaniel Pasarell no se refería únicamente a una fecha anterior a aquella en que la demandante cumplía su mayoría de edad sino en términos generales a si la demandante "en alguna época" solicitó autorización del Sr. Pasarell para vender los solares hipotecados (págs. 127, 190 y 191 T. de E.) debiendo por tanto dichas cuestiones ser resueltas por la corte inferior de acuerdo con el alcance legal de la prueba que se admita y los hechos que considere probados en relación con la ratificación y si el contrato, de acuerdo con dicha prueba era confirmable o no.

POR TANTO, se declara sin lugar la moción de reconsideración.