ENRIQUE GARRIGA BENGOA, recurrente, *v.* COMISIÓN INDUS-
TRIAL DE PUERTO RICO, ETC., demandada.

Número: 605    Resuelto: 11 de marzo de 1963

*José A. Suro, Antonio José Amadeo* y *Antonio José Amadeo,
Jr.,* abogados del recurrente; *M. Orraca Torres,* abogado
de los beneficiarios del obrero occiso.

Sala integrada por el Juez Asociado Señor Belaval como Pre-
sidente de Sala y los Jueces Asociados Señores Hernández
Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opi-
nión del Tribunal.

Los familiares de José A. Arroyo acudieron a la Comi-
sión Industrial contra el recurrente Enrique Garriga Ben-

goa, en solicitud de compensación. Expusieron que Arroyo sufrió un accidente del trabajo del cual falleció, mientras trabajaba para dicho recurrente cuidando un camión de su propiedad. Después de los trámites y vistas de rigor la Comisión Industrial resolvió que el occiso había sufrido un accidente en el curso y como consecuencia de su trabajo cuando realizaba una gestión inherente al mismo y mientras trabajaba para el patrono Enrique Garriga Bengoa, quien no era un patrono asegurado, por lo que éste debía responder del accidente ocurrido al obrero. Ordenó al Administrador del Fondo que procediera a liquidar el caso cobrándole al recurrente la compensación más los gastos habidos, y que la hiciera efectiva a los beneficiarios. En apoyo de su decisión la Comisión Industrial hizo las siguientes conclusiones:

"La prueba presentada por los beneficiarios nos mereció entero crédito y de ella surge lo siguiente:

Que el patrono Enrique Garriga Bengoa se dedica al negocio de transportación terrestre y no estaba asegurado con el Fondo del Estado para cubrir este riesgo.

Que allá para el 3 de diciembre de 1959 un truck de su propiedad guiado por el Sr. Rufino Delgado Escuté, quien trabajaba a por ciento, sufrió una avería en la Carretera Militar cerca del matadero. Que en los momentos que estaba el truck detenido en medio de la carretera pasó el Sr. Barnés, concuñado de Garriga Bengoa dueño del truck y al enterarse que era el truck de su concuñado trató de localizarlo por teléfono a Coamo donde vivía el Sr. Garriga Bengoa y no pudo comunicarse directamente con él.

Que luego pudo localizarlo y el Sr. Garriga le dijo que llamara a la Puerto Rico Iron para que con una grúa trataran de sacar el truck de donde estaba.

Que no consiguieron la grúa y el Sr. Barnés se dirigió con Luis Alvarez a Bayamón a buscar la grúa y tampoco consiguieron porque no tenía luz. Que llegaron al sitio de los hechos y estaba allí la policía.

Que el chófer del truck, luego de poner las luces, se fué a su casa en Trujillo Alto a comer con ideas de regresar al sitio donde estaba el truck y no regresó.

Que el Sr. Luis Alvarez le ofreció al Sr. Barnés venderle un diferencial para el truck que estaba dañado y en vista que el dueño del truck no había comparecido dejaron el negocio pendiente.

Que el Sr. Barnés preguntó quién se podía quedar cuidando el truck a lo que se ofreció el Sr. José Antonio Arroyo quien se encontraba por allí cerca, informando dicho obrero que se quedaría allí hasta las 6:00 de la mañana y que el trabajo valía $10.00.

Que mientras hablaban Barnés, Arroyo y Alvarez pegados al truck, vino un automóvil y arrolló a Luis Alvarez y a José Antonio Arroyo Rodríguez, causándole la muerte a éste último.

"No queda en nuestro ánimo duda alguna de que el Sr. Barnés actuaba como Agente de su concuñado Enrique Garriga Bengoa y como tal en los momentos en que sufrió el accidente José Antonio Arroyo Rodríguez se encontraba realizando una gestión a favor del patrono Enrique Garriga. No creemos que el obrero pudiera ofrecer su servicio hasta las 6:00 de la mañana por pura cooperación.

"Al analizar las declaraciones de los testigos llegamos a la conclusión de que José Antonio Arroyo fué empleado por el patrono no asegurado Sr. Garriga; que contrató los servicios de José Antonio Arroyo para atender, guardar y custodiar el truck propiedad de dicho Sr. Garriga, el cual había sufrido un desperfecto, y en el cumplimiento de sus deberes fué que le ocurrió el accidente.

. . . . . . . .

"Estamos asimismo de acuerdo con los reclamantes de que el trabajo realizado por el obrero José Antonio Arroyo en los momentos que sufrió su accidente era en beneficio del patrono no asegurado Enrique Garriga Bengoa, que en esos momentos era un empleado de dicho patrono y su caso cae dentro de servicios de Emergencia (Emergency Acts).

. . . . . . . .

"No podemos considerar que un mero voluntario sea un empleado, sin embargo, en una emergencia el voluntario puede convertirse en empleado. En el caso que nos ocupa hubo más que un acto voluntario, hubo un requerimiento de un agente del patrono para que cuidara el truck, servicio que sería paga-

do por $10.00. La prueba presentada por los beneficiarios nos probó a la saciedad este punto.

.     .     .     .     .     .

"En otras partes de esta resolución hemos utilizado el término 'Agente' al referirnos al Sr. Barnés y creemos que efectivamente en esos momentos el Sr. Barnés actuaba de agente y/o representante de Enrique Garriga Bengoa ya que además de haber sido utilizado el término por el propio patrono, también la actuación así lo demuestra. El Sr. Barnés recibió instrucciones para proteger la propiedad del patrono, o sea, el truck que se había dañado en el medio de una de las carreteras más transitadas de Puerto Rico, como lo es la Carretera Núm. 2."

Solicitada la reconsideración del fallo, la Comisión, esta vez con el desacuerdo del Comisionado señor De Jesús Mangual, ratificó el mismo. El caso está ante nos en revisión.

La exposición de los hechos que consideró probados la Comisión está sustancialmente sostenida por el récord. Nos parece, sin embargo, que la misma no ofrece una idea total de todas las circunstancias que rodearon el hecho para la determinación de una relación obrero-patronal entre el occiso y el recurrente que le obligue a compensar, no siendo un patrono asegurado. Esta relación obrero-patronal depende a la vez de la determinación de si la persona que convino el trabajo con el obrero era agente del recurrente que podía en ley obligarlo con sus actos.

■ Según el Art. 11 de la Ley de Compensaciones por Accidentes del Trabajo, —Ley Núm. 45 de 18 de abril de 1935—, la revisión de este Tribunal solamente podrá concederse sobre cuestiones de derecho o apreciación de prueba cuando ésta sea de carácter pericial. Bajo la situación peculiar que presenta este caso la conclusión sobre la existencia de una relación obrero-patronal resulta ser, en última instancia, una determinación dual de hecho y de derecho. Por consiguiente, el efecto legal que la Comisión dio a los hechos que estimó probados conducente a establecer tal relación obrero-patronal es revisable como una cuestión de

derecho. *Montaner, Admor.* v. *Comisión Industrial,* 54 D.P.R. 722; cfr. *Ortega* v. *Comisión Industrial,* 73 D.P.R. 191. Cfr. *Villaronga* v. *Tribunal de Distrito,* 74 D.P.R. 331, 344; *Sanabria* v. *Sucn. González,* 82 D.P.R. 885, 994.

La única prueba sobre los hechos presentada por los reclamantes fue la declaración del testigo Luis Álvarez, a quien la Comisión le dio entero crédito. Al terminar su trabajo como a las tres de la tarde pasó por frente a la Brugal en la carretera de Bayamón y vio el camión del recurrente averiado. El chofer le informó que el vehículo era de una persona de Coamo. El camión tenía el diferencial roto y el testigo poseía uno que interesaba venderle al dueño. El testigo se fue y volvió al sitio como a las siete de la noche. Le preguntó al chofer si había llegado el dueño del camión y aquél le dijo que no, pero que por ahí había uno que decía que era cuñado del dueño. Arroyo, el occiso, esta vez estaba dando vueltas por allí. El testigo localizó al cuñado [Barnés] y hablaron. En lo relativo al empleo de Arroyo, la declaración de Álvarez fue así: "El, como era cuñado del dueño del truck, trató de ayudar a quitar el truck y si era posible arreglarlo." Barnés y el testigo fueron a Bayamón a buscar una grúa para llevarse el camión y no la consiguieron. "P. ¿Usted oyó hablar al señor Barnés y al señor Arroyo? R. Sí, señor . . . El le informó que se quedara cuidando el truck... R. En esos momentos le informó: ¿Y quien me va a pagar? P. ¿Quien dijo eso? R. El muerto. Y él le dijo: 'Mi cuñado viene esta noche o mañana'. Como yo [el testigo] conocía al muchacho, le dije: 'Quédate cuidando el truck, que si no aparece por la mañana, yo te reembolso el dinero y yo le cobro a él por la mañana'. Yo tenía un negocio, que estaba esperando que viniera el dueño del truck."

El testigo relató entonces que Barnés y él fueron a un negocio a 30 metros del sitio y Barnés se comunicó por telefono con su cuñado. Acompañó a Barnés porque tenía que

tratar sobre un diferencial que tenía que le servía al camión. Sobre el accidente: "R. Cuando el señor Barnés llegó conmigo de Hato Tejas, acordamos que ya no iba a venir el señor Bengoa. Entonces estuvimos hablando un rato por si venía, porque tenía la esperanza que llegara. [Com.] P. ¿Que llegara quien? R. El señor Barnés tenía esperanza que llegara el señor Bengoa, pero cuando ya sabía que no venía, me dijo: 'Yo me voy a dormir y que mañana él resuelva todo lo que tiene que resolver con el muchacho.' En ese momento el señor Arroyo me informó a mi que no había comido por la tarde... P. ¿Que hizo usted entonces? R. El señor Arroyo me pidió un dinero para comer... P. Con motivo de que él le dijo a usted y con motivo de lo que él le pidió a usted, ¿qué usted hizo? R. Yo le di el dinero a él y él me dijo que le ayudara con una luz, y cuando estábamos bajando la luz para prenderla, fue que el carro vino de virazón y de ahí para acá no se. El iba a comer después y yo tenía el truck alineado y lo iba a cuidar en lo que él venía. P. ¿quién dejó allí a José Antonio cuidando el truck?... R. Allí lo dejó cuidando el truck el señor Barnés."... [Com.] "Testigo, diga con calma lo que dijo el Policía, y lo que dijo Arroyo y lo que dijo Barnés. R. Le voy a explicar. Como se estaba tratando de quitar el carro, o sea, la Policía le dio 15 minutos para quitar el carro. Entonces el señor Barnés le dijo al Policía: 'Yo voy con este señor, que me dijo que podía conseguir una grúa, (y se refería a mí), para quitar el carro del medio.' El chofer le dijo: 'Yo me voy.' Entonces el Policía dijo: 'Deje cuidando ese carro ahí mientras tanto.' El señor Barnés preguntó a quien se podía dejar cuidando el carro y el señor Arroyo que estaba presente dijo: 'Yo puedo quedarme cuidando el carro.' Y entonces Arroyo dice: '¿Y quién va a pagar esto?' Dijo Barnés: 'Si viene el cuñado te paga, y si no viene, yo te pago.' Yo le dije: 'Quédate que si acaso él no te paga, yo te pago mañana, que yo voy a ver si mañana viene el

dueño del truck para venderle el diferencial.' Yo le dije: 'Mañana yo le digo que el señor Barnés te dejó cuidando el truck y que yo te pagué.' Entonces fue que salimos para donde el señor Antonio Guadarrama para buscar una grúa." Declaró también el testigo que Arroyo trabajaba como operador de equipo pesado, que no oyó la conversación telefónica de Barnés con el cuñado, y que Arroyo había fijado una compensación de $10.00 por el cuido hasta las 6 de la mañana, y que a las 8 tenía que irse para su trabajo. El testigo fue lesionado junto con Arroyo y se despertó a los 12 días en el Hospital donde estuvo recluido durante un mes.

El récord demuestra otros hechos no controvertidos que no están en conflicto con el testimonio de Álvarez, y que de no ser irreales o inverosímiles en sí, o de no estar tachado el testigo, deben ser tomados en cuenta junto con los demás. Cfr. *Villaronga* v. *Tribunal*, supra.(¹) Entre Barnés y el recurrente no existían relaciones de negocio o trabajo de índole alguna. Sólo eran concuñados. Accidentalmente Barnés vio el vehículo averiado como a las tres de la tarde. Se le pareció al del recurrente y el chofer se lo confirmó. Una hora después, de regreso, se detuvo y el chofer le pidió que llamara a Garriga a Coamo. En una segunda llamada como a las 5 de la tarde habló con él y Gárriga le dijo "que llamara a la Porto Rico Iron, que ellos se encargaban de sacar el truck de allí, lo que hice... El me dijo que me hiciera cargo del truck, que lo sacara de donde estaba, que la Porto Rico Iron se encargaba del asunto." No le dio instrucción otra alguna. A las 6 de la tarde, volvió al sitio a ver si ya habían sacado el camión, y no lo habían sacado. Ahora encontró a Álvarez, quien le habló, él le dijo que no era el dueño, pero aquél insistió en venderle una pieza.

---

(¹) En casos para determinar la condición de patronos no asegurados, dispone el Art. 15 de la Ley que la Comisión dará oportunidad al obrero y al patrono de ser oídos y defenderse, ajustándose en lo posible a las prácticas observadas en las cortes de distrito [hoy Tribunal de Primera Instancia].

Abandonó el sitio y volvió después de las siete. Álvarez estaba allí insistiendo en venderle la pieza. Vio allí a Arroyo. Se fue con Álvarez a Bayamón a conseguir una grúa para sacar el truck, y al no conseguirla volvió al sitio. Llamó de nuevo a Coamo desde el negocio que dijo Álvarez y Garriga le "repitió que hiciera lo posible por sacar el truck del sitio." Al ocurrir el accidente el chofer se había ido. Arroyo, Álvarez y él se encontraban situados en forma triangular, a la distancia de una conversación, no podría determinar si Arroyo estaba arreglando una luz "porque en esos momentos viré para atrás y me pude salvar."

El chofer residía en Trujillo Alto y trabajaba él solo en el camión, a por ciento. Estuvo en el sitio hasta las seis, le preguntó a la patrulla si se podía ir porque ya había dejado las luces de reglamento prendidas, y le dijeron que sí. La Policía no le exigió que dejara a nadie cuidando. Barnés no estaba presente cuando él se fue. El testigo iba a su casa a comer para regresar. A las 9 de la noche trató de hacerlo pero no encontró transportación para venir al sitio. Antes de irse hizo con otra persona 5 grillas o luces y las dejaron prendidas en el camión, más la luz de reglamento. En ese momento Barnés no estaba allí.

El recurrente declaró que al informarle Barnés de la rotura del camión le dijo "que tratara por todos los medios de remover el truck; que llamara a la Porto Rico Iron, que ellos tenían grúas para mover equipo pesado." Ninguna otra instrucción le dio. Solamente el chofer trabajaba en el camión a un 25%. Surge también del récord que la persona fallecida era un operador de equipo pesado que ganaba un mínimo de $1.25 la hora y tenía trabajo permanente. No se dedicaba habitualmente a la labor de cuidar, o de guardián o celador.

■ Considerando la manera en que se desarrollaron los hechos, que no estuvo previamente calculada en el establecimiento de un contrato de empleo, así como todas las de-

más circunstancias alrededor de los mismos, la prueba no sostiene de manera persuasiva la existencia de una relación obrero-patronal *creada* de hecho y de derecho por el recurrente, ni directa, ni tampoco indirectamente o implícita, a través de un mandato autorizado. Que tal no fue la intención del recurrente lo confirma el hecho de que toda la gestión de Barnés, aunque sin éxito, estuvo encaminada a retirar el vehículo del sitio según las instrucciones recibidas. En cuanto a la transacción con Arroyo, la prueba pone a pensar si realmente fue la iniciativa o gestión de Barnés o más bien la del testigo Álvarez, interesado como estaba, la más decisiva.

Bajo los principios generales aplicables al mandato no parece que Garriga tuvo en su mente resolver la situación de manera que hubiera requerido autorizar la contratación de los servicios de una persona para el trabajo de custodiar el vehículo en la calle, convirtiéndose en patrono sabiendo que no estaba asegurado. En las dos ocasiones en que intervino insistió en la gestión para que el vehículo se sacara del sitio prontamente por una entidad que él sabía que tenía el equipo para hacerlo, contrario a la idea de que el camión se quedará allí. Aceptando, al igual que la Comisión, que Barnés gestionó o permitió los servicios del obrero, en momento alguno el dueño tuvo conocimiento de este hecho antes de ocurrir la desgracia. Cfr. Art. 1792 del Código Civil (ed. 1930): "La ratificación de la gestión por parte del dueño del negocio, produce los efectos del mandato expreso." Y véanse los Arts. 1605, 1610 y 1618. Cfr. *Gordils* v. *Sucs. de Frontera*, 21 D.P.R. 227; *López Landrón* v. *Registrador*, 15 D.P.R. 722; *Lókpez* v. *Lókpez*, 61 D.P.R. 618, pág. 621; *Font* v. *Registrador*, 57 D.P.R. 648, pág. 651; *Junta de Rel. del Trabajo* v. *Cía. Popular*, 77 D.P.R. 1, pág. 7.

Somos conscientes, como lo hemos sostenido tradicionalmente, que el estatuto de compensaciones sobre accidentes del trabajo debe interpretarse liberalmente en favor del

obrero a quien la ley ha querido proteger. El propio estatuto dispone en su Art. 2 que cualquier duda razonable que en su aplicación surgiere en cuanto a la existencia de relación causal entre el trabajo u ocupación del obrero o empleado y la lesión, incapacidad o muerte, o el carácter ocupacional de una enfermedad, deberá resolverse a favor del obrero o empleado o de sus beneficiarios. Recientemente hemos tenido oportunidad de aplicar en toda su extensión y significado la anterior disposición en *Feliciano Figueroa* v. *Comisión Industrial*, 84 D.P.R. 196 (1961), y *Vda. de Meléndez* v. *Comisión Industrial*, 85 D.P.R. 58 (1962). Ambos casos son típicos de la relación causal entre la lesión o muerte y el empleo, sin que estuviera en discusión el empleo mismo.

El problema que presenta este caso, sin embargo, se remonta más lejos. No es cuestión de resolver dudas, dentro del propio sistema de seguro, sobre si existe o no *relación causal* entre el trabajo y la lesión o la muerte, lo cual la experiencia ha demostrado que cubre un vasto campo de criterios periciales y no periciales en conflicto. El problema ante nos es más bien si se creó o no en ley una relación obrero-patronal que convertía al recurrente en un patrono no asegurado, con las consecuencias que ello tiene. En la situación peculiar de este caso cobran aun mayor virtualidad los artículos y principios antes citados sobre la gestión o mandato. La acción del mandatario, de no ser autorizada o ratificada, no sólo sometía al mandante en este caso a una responsabilidad pecuniaria dentro de un régimen especial de ley sin las defensas que de ordinario tendría en una acción civil corriente de daños, o de cumplimiento de una obligación, sino que también lo convertía en un delincuente penal—Art. 17 de la Ley—creándole un *"status"* de patrono en violación del estatuto.

■ La doctrina aplicable al trabajo de emergencia no resuelve este caso en las circunstancias del mismo. Debe

haber siempre, en principio, un vínculo jurídico que ate al alegado patrono con la responsabilidad que la ley le impone, como ocurriría en el caso típico del empleado o dependiente que en el desempeño del empleo se enfrenta a una situación de emergencia o inesperada y que para proteger los intereses de su patrono, o para resolver la situación, recluta o usa los servicios de una persona. Se ha sostenido que en tal caso la acción del empleado no estaría tan desvinculada de las funciones del empleo como para no crear una relación de trabajo con la tercera persona. De todos modos, siempre han de tomarse en cuenta las circunstancias, el grado de emergencia o peligro, la necesidad de la acción tomada, la posibilidad o no de comunicación con el patrono y cualesquiera otras pertinentes. Asumiendo que entre el chofer del camión y el recurrente existía la relación de patrono y empleado, no fue el chofer, ni en su presencia, quien gestionó los servicios de la víctima. **Cfr.** Larson's *Workmen's Compensation Law*, sec. 47.42 (c) pág. 699; Schneider's *Workmen's Compensation*, Vol. 1, págs. 598, 626-628; Horovitz *Injury and Death Under Workmen's Compensation Laws*, págs. 117, 118, 203.

En vista de lo expuesto, no es necesario discutir ni resolver el segundo planteamiento del recurrente: que éste era un empleo casual, excluido por la propia Ley.

*Se revocará la Resolución de 10 de mayo de 1961 que declaró al recurrente patrono no asegurado y le impuso responsabilidad pecuniaria por el accidente ocurrido en este caso, y se devolverán los autos a la Comisión Industrial con instrucciones de que desestime los procedimientos.*