VÍCTOR FELICIANO FIGUEROA, recurrente, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO, recurrida.

*Número:* 563    *Resuelto:* 18 de diciembre de 1961

*Stanley L. Feldstein,* abogado del recurrente; y *Donald R. Dexter,* abogado de la recurrida.

Sala integrada por el Juez Asociado señor Belaval como Presidente de Sala y los Jueces Asociados señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

El obrero recurrente sufrió un accidente del trabajo el 13 de julio de 1956 al caerse a una altura de 25 pies de la escala de un barco lesionándose la pierna izquierda. Fue atendido por el Fondo del Seguro del Estado y en 7 de agosto de 1956 se le dio de alta curado sin incapacidad. El obrero apeló a la Comisión Industrial que con miras al informe de sus médicos ordenó, en agosto 29, 1956, que el recurrente recibiera mas tratamiento del Fondo. Placas radiográficas para esta fecha demostraban una periostitis del tercio superior del fémur izquierdo. En noviembre 15, 1956 fue nueva-

mente dado de alta por el Fondo sin incapacidad. Apeló a la Comisión alegando que no podía trabajar y para que se le fijara una incapacidad. El examen médico determinó que había sufrido un hematoma calcificado del fémur izquierdo y que existía una ligera atrofia del muslo y limitación moderada de la flexión de la pierna sobre la rodilla. La Comisión, en 21 de diciembre de 1956, dictó resolución que luego enmendó en 4 de enero de 1957, fijando una incapacidad equivalente a la pérdida de un 10% de las funciones fisiológicas de la pierna izquierda en o más arriba de la rodilla. El obrero solicitó reconsideración pero fue declarado sin lugar por radicarse fuera de tiempo.

De algún modo que no consta en los autos, el recurrente acudió al Fondo y aparece en el récord un informe del Dr. J. M. Quiñones fechado 6 de marzo de 1957 haciendo constar que no encontraba atrofia ni deformidad anatómica y los movimientos de la pierna izquierda eran completamente normales aunque el obrero alegaba dolor en dicha pierna, y que no existía recidiva del accidente sufrido en 13 de julio de 1956. Contra esta determinación el obrero acudió a la Comisión Industrial y ante su persistencia de sentir mucho dolor y malestar en el muslo izquierdo, fue referido al Ortopeda Dr. Aníbal Lugo para examen. En abril 3, 1957 el Dr. Lugo rindió un informe a la Comisión haciendo constar que el obrero aparecía cojeando y caminaba con la ayuda de un bastón. Había una atrofia de una pulgada de los músculos del muslo y los movimientos de flexión en el muslo eran limitados. Observó que podía ser ayudado con alguna fisioterapia.

En 3 de junio de 1957, después de una vista pública y oir prueba, apareciendo que las radiografías demostraban una periostitis del fémur izquierdo con hematoma calcificado y que el obrero alegaba intenso dolor, la Comisión Industrial ordenó al Fondo que suministrara tratamiento médico hasta la total curación.

Fechado 16 de julio de 1957 hay un informe médico del Fondo dictaminando que el obrero presentaba la misma incapacidad que le fuera fijada en 21 de diciembre de 1956 por la Comisión Industrial y aparentemente terminaba el tratamiento ordenado. De este dictamen acudió ante la Comisión el recurrente alegando que estaba sufriendo una completa parálisis e incapacidad total de la pierna izquierda que le impedía trabajar y caminar sin la ayuda de un bastón. Fue referido nuevamente al Ortopeda Dr. Lugo para examen. En 15 de agosto de 1957 el Dr. Lugo rindió un informe expresando que el hombre todavía cojeaba y se quejaba de debilidad y de dolor en la extremidad inferior izquierda afectada, y que las medidas todavía demostraban una considerable atrofia de la musculatura de toda la extremidad. Opinó el Dr. Lugo que aún él creía que la pierna se le podía fortalecer con la adecuada terapia física.

En 19 de septiembre de 1957, después de otra vista pública la Comisión refirió el caso nuevamente al Fondo para que le proveyera el tratamiento médico indicado por el Dr. Lugo. En 15 de noviembre de 1957 el Fondo emitió un informe médico haciendo constar que se había dado el tratamiento dispuesto, ratificando la incapacidad de un 10% concedida. De nuevo ante la Comisión apelando de dicho dictamen, el obrero alegó que no solamente no estaba curado sino que se encontraba peor de salud al extremo que apenas podía caminar. En 27 de diciembre de 1957 la Comisión confirmó dicho dictamen de incapacidad. El obrero solicitó reconsideración acompañando a su escrito un informe médico del Dr. Julio Lergier del Departamento de Salud, Educación y Bienestar de la Administración de Seguro Social, que en una vista posterior se admitió en evidencia, en donde se diagnosticó la pérdida de la función en un 75% de la pierna izquierda, atrofia en un 90% de los músculos de la pierna izquierda, 80% en pérdida de la función de la mano izquierda, periostitis crónica en el fémur izquierdo. Este

informe, fechado el 8 de enero de 1958, hace constar que el obrero está total y permanentemente incapacitado. En 28 de enero de 1958 se declaró sin lugar la reconsideración solicitada, y se ratificó dicho dictamen en 25 de febrero de 1958 resolviendo una segunda moción de reconsideración, interpuesta esta vez por medio de abogado.

Fechado 4 de junio de 1958 aparece otro informe médico del Fondo al efecto de que no existía evidencia de reactivación de periostitis por lo que no había recidiva. De este dictamen apeló el obrero y, examinado nuevamente, los médicos determinaron lo siguiente: "En vista de la atrofia progresiva y así como también tomando en consideración que la extremidad superior izquierda aparece ahora con una limitación en la elevación del brazo sobre el hombro, se hace necesario una evaluación del Neurocirujano del Fondo del Estado." De conformidad con dicho dictamen en junio 19, 1958 la Comisión refirió nuevamente el caso al Fondo.

En 23 de julio de 1958 el asesor médico de la Comisión Dr. A. Oliveras Guerra envió el caso al Dr. Ricardo Cordero para examen e informe. El Dr. Cordero sometió su informe en 24 de julio de 1958 haciendo constar que el obrero se había presentado ayudándose de dos muletas pero aún así apenas podía caminar y que cada movimiento era una contorsión que indicaba un intenso sufrimiento físico. El examen de neurología revelaba: "franca atrofia muscular de la pierna izquierda, con una circunferencia de dos pulgadas menos que la otra a nivel del tercio medio de los muslos y de una pulgada y cuarto a nivel del tercio medio en las pantorrillas. Pérdida casi total de la movilidad voluntaria en la pierna izquierda. Ausencia de sensación al dolor, al tacto y a las vibraciones en las dos extremidades y mitad correspondiente del tronco en el hemicuerpo izquierdo. Reflejos tendinosos y plantares vivos e iguales en las extremidades inferiores; reflejos ósteotendinosos vivos e iguales en las extremidades superiores. No presenta signos pira-

midales. Dolor intensísimo al hacerle movimientos pasivos en la pierna izquierda. Comentario:—Como puede verse, el paciente muestra francas alteraciones sicofuncionales implantadas en una experiencia traumática. Creo que debe ser referido a un siquiatra."

En vista de dicho informe se refirió al recurrente al Fondo para examen del siquiatra a lo cual el Fondo se negó por creerlo innecesario de acuerdo con sus médicos, y la Comisión entonces, en 17 de septiembre de 1958, refirió el caso para examen e informe al siquiatra Dr. Arturo Flores Gallardo. Después de hacer detalladas observaciones en torno al obrero,—entre ellas que le había dicho al referirle el accidente bajando la escala con un cubo de agua en la mano "Me salvé de milagro; hacía pocos días un americano se había matado por esa escala",—el Dr. Flores Gallardo hizo constar lo siguiente: *"Impresión:* El lesionado Víctor Feliciano Figueroa actualmente tiene una reacción de conversión (histeria) manifestada por alegada ausencia de sensaciones en la pierna izquierda, disminución de la fuerza en el brazo izquierdo, e inabilidad de mover la pierna izquierda. Se puede decir que el accidente que tuvo el 13 de julio de 1956 ha servido de núcleo para el desarrollo de esta reacción de conversión. Aparentemente el Sr. Feliciano estaba atravesando por unas condiciones económicas malas para la fecha del accidente. Es bueno recordar que dos meses antes del accidente él había sido padre del sexto hijo. Se puede decir que el golpe sostenido por el lesionado no es la causa de sus síntomas actuales pero que sí le ha servido de vehículo para la expresión de sus conflictos. Prognóstico es muy pobre."

Haciendo referencia a lo antes transcrito, en 21 de octubre de 1958 la Comisión Industrial dictó resolución resolviendo que "en vista de que los Neurocirujanos y Psiquiatras, tanto del Fondo del Seguro del Estado, como de la Comisión Industrial, opinan que la condición del obrero no

se produjo como consecuencia del accidente", se confirmaba
la decisión del Administrador del Fondo. Solicitada recon-
sideración, la Comisión señaló una vista el 10 de diciembre
de 1958 en la cual se practicó prueba.

Declaró el obrero en dicha vista que al caerse de la escala
quedó sostenido y se le fue una pierna por uno de los palos
atravesados recibiendo golpes en la cadera y muslo izquier-
dos, región inguinal y en la rodilla; que no había podido tra-
bajar más después del accidente, siempre había sentido que
ahí había un hueso que le hincaba, señalándose la cresta
ilíaca izquierda, y no lo dejaba nunca afirmar; que esa
hincada le impedía hacer fuerza y si trataba de hacerla el
hueso le hacía quedar muerta la pierna y tenía que arras-
trarla; que tiene que usar muletas siempre para cualquier
cosa y las tiene al lado de la cama porque no puede dar un
paso sin ellas; que antes del accidente estaba bien, tenía un
buen estado de salud, trabajaba en mar abierta, pasando y
brincando de ancón en ancón, trabajaba todos los turnos que
le daban y algunas veces los "turnos suicidas" de las doce
de la noche a las seis de la mañana.

Declaró la esposa del obrero que llevaban 14 años de
casados; antes del accidente su esposo era muy saludable, no
se sentía nada, trabajaba siempre; nunca había notado enfer-
medad en él; que estaba bien de su mente; después del acci-
dente él ha estado bastante mal, sufriendo, no ha trabajado
ni un solo día; que siempre usa las muletas y no se puede
bajar de la cama solo. Después del accidente su esposo no
puede andar y está muy mal del cerebro expresando que era
que le dolía mucho el cerebro y cuando estaba mucho sentado
y daba algunos pasos tenía una "complicación" en el cerebro
y se ponía malísimo y en ese estado se quejaba mucho.

Declaró el Dr. Arturo Flores Gallardo explicando su
propio informe. Dijo que al examinar al obrero lo encontró
en buen contacto con la realidad, bien orientado, sin que
hubiera síntomas de que estuviese padeciendo sicosis. Que

había concluido que tenía una reacción de conversión comunmente llamada "histeria" (histerismo), manifestada por la alegada ausencia de emociones en la pierna izquierda, disminución de la fuerza en el brazo izquierdo e inestabilidad de mover la pierna izquierda. El golpe no fue la causa del histerismo de conversión y solamente sirvió de vehículo para la expresión de sus conflictos, explicando que ello quería decir que el golpe había servido de excusa para el obrero desplazar conflictos emocionales internos. Definiendo lo que es una conversión histérica explicó que era una reacción donde unos conflictos internos son desplazados al cuerpo, a aquella parte que está enervada por el sistema voluntario y en donde no había una causa orgánica que explicara tales síntomas. Preguntado si tal reacción era una manifestación subjetiva u objetiva el médico expuso que el obrero *la siente*, o sea que *para él era una condición real y verídica*, y que en su condición actual este obrero no estaba en condiciones de trabajar. Podía usar la mano derecha y la mano izquierda hasta cierto punto. Una persona que padece de una reacción de conversión aunque no es sicótica, *es anormal*, y dicha reacción puede ser un impedimento para trabajar. No conoció al obrero antes del accidente pero por información, él trabajaba y ganaba su subsistencia y se llevaba bien con la gente. Dijo el facultativo que esta reacción histérica no se origina con un trauma, *pero sí puede desencadenarse y desarrollarse o evolucionar* con el trauma. Explicó que al decir en su informe que el accidente había servido de "núcleo" para el desarrollo de esta reacción usó el término en el sentido de vehículo. El golpe fue el vehículo para el desarrollo de la reacción. Por definición, no existía dicha reacción antes del golpe pero sí las bases, la reacción clínicamente como la conocen los médicos, surgió después del trauma.

Al decir en su informe que el golpe no era la "causa" de los síntomas actuales, explicó que "causa" de una reacción de conversión es una causa sicológica, emocional, y el golpe

no tenía que ver con la causa. Al dictaminar que el prognóstico era muy pobre quiso decir que las oportunidades de que el lesionado pudiera caminar sin muletas, que pudiera caminar otra vez o que recobrara lo que él dice que ha perdido, que no tiene sensación en la pierna izquierda, eran muy pobres esas oportunidades y probablemente el obrero iba a quedar en ese estado el resto de su vida, y actualmente ese era un estado de completa incapacidad. También explicó que desde el punto de vista casuístico, "causa" según lo usó en su informe no era relación causal y que en sentido médico por causa entendía conflicto interno y no aquella cosa o manifestación que directamente produce cierto resultado.

El Dr. H. Vázquez Milán declaró que el Administrador había fijado una incapacidad de un 10% de la pierna izquierda por encima de la rodilla debido a una periostitis traumática y que luego se hicieron otros exámenes sin que apareciera que esa condición hubiese aumentado, pero alegando el obrero dolor en el hombro y brazo izquierdos, y siendo el trauma en la extremidad inferior, creyeron necesario el examen de un neurocirujano para una evaluación del sistema neurodinámico. Los neurocirujanos consideraron la intervención de un siquiatra por considerar que el estado era más bien psicofuncional. Expresó el Dr. Vázquez Milán que en distintas ocasiones en casos similares a éste en que ha habido un traumatismo de la naturaleza del que sufrió el obrero que dejara una sintomatología que se mezclara en cierto modo con un aspecto psicofuncional de la condición que en ese día presentaba el obrero y había venido presentando durante los últimos meses, es difícil llegar a una conclusión categórica para determinar hasta qué punto la condición ésta pudo, de una manera directa o indirecta, estar relacionada con su accidente, por lo que quedaba a la Comisión el determinar si los informes médicos expresados señalaban una condición de histerismo de con-

versión que pudiera mezclarse con una condición orgánica como la dianosticada. Opinó que si la cuestión a determinar era la existencia de una recidiva, ésta no existía, entendiendo por recidiva una extensión o reactivación de la condición periostítica. Manifestó además que al fijarse la incapacidad no se consideró la reacción histérica que no existía a la fecha en que se determinó la misma. Dijo que la condición del obrero era peor, más grave, que la que existía al tiempo de concederse la incapacidad.

En 14 de enero de 1959 la Comisión, "en vista del testimonio médico", resolvió "que la condición de reacción de conversión que presenta el lesionado no fue causada por el alegado accidente y que en la actualidad no presenta recidiva alguna del mismo", y procedió a desestimar el recurso. Este es el fallo que estamos revisando.

Ante tal historial en el récord, la Comisión recurrida erró en su evaluación y aquilatamiento de la prueba médica. Enfocando el caso con aquel grado de objetividad necesario en una situación que envuelve la subsistencia y bienestar de un obrero que por desgracia sufrió un accidente mientras trabajaba, bajo un estatuto que le da protección en tales casos, y no meramente como el problema clínico de interés para el estudio en este campo de las neurosis, nos situaríamos de espaldas a la realidad de los hechos en el récord si concluyéramos que la condición y el estado de incapacidad del recurrente al tiempo de desestimársele su recurso no tenía una relación causal directa con el accidente sufrido. Los médicos dijeron que no había una recidiva de la lesión misma según fuera diagnosticada, o sea que la condición de periostitis del fémur se hubiera agravado o extendido; pero el problema que presenta este recurso se proyecta considerablemente más allá de eso. No es este el caso de un obrero curado que vuelve a su actividad normal y luego sufre un recrudecimiento o reagravación del traumatismo corporal. Por lo que demuestra el récord, en este caso el obrero senci-

llamente nunca recuperó su capacidad normal de trabajo por la sico-neurosis que le sobrevino, aún cuando el golpe físico en sí, aparentemente de no severas consecuencias, se curara o no se recrudeciera.

El dictamen del Dr. Cordero en cuanto a la atrofia muscular progresiva, pérdida de movilidad y falta de sensación al dolor, al tacto o a las vibraciones, así como el dictamen del siquiatra de que la reacción de conversión sico-neurótica era una realidad verídica y real para el obrero, quien la sentía; y la ausencia en el récord de otros detalles que ayudan en estos casos a distinguir un fingimiento de la enfermedad, demuestran que el obrero no mentía ni engañaba cuando desde un principio en las distintas vistas celebradas y ante los médicos él decía,—a su manera de describir esta parálisis de tipo neurótica,—que la pierna se le estaba secando y se le iba muriendo. El siquiatra Dr. Flores Gallardo dijo que el golpe fue el vehículo que hizo desplazar al cuerpo en una reacción histérica de conversión conflictos internos cuyas bases él consideraba preexistentes. Como suele suceder en la ciencia médica, esta última parte de la conclusión descansaba en la hipótesis de una existencia de tales previos conflictos.

La prueba no controvertida, que a falta de expresión en contrario debemos presumir que le mereció crédito a la Comisión, no demostró que existieran en este obrero conflictos previos al accidente que en hipótesis presumía el siquiatra. Este obrero era saludable, trabajaba normalmente a capacidad en un trabajo rudo, y conservaba un hogar constituido con esposa e hijos. Nada en la prueba indica que antes él padeciera de algún trastorno de la personalidad o que tuviera problemas emocionales de una manera particular, más allá de los que normalmente se puedan tener en el plano en que cada uno desarrolla su vida de convivencia. Tampoco podría asegurarse con absoluta certeza que tales conflictos de la personalidad o las bases de los mismos no preexistieran. ■

Sí surge del récord con la necesaria certeza que aún cuando existieran previamente al accidente, según la hipótesis médica, dichos conflictos internos no habían producido en el obrero, hasta ocurrido el accidente, incapacidad para trabajar en grado alguno; y partiendo de la base de que los conflictos emocionales,—causa médica de la reacción de conversión,—existieran antes, surge con mayor certeza que el accidente vino a ser el medio o vehículo que desencadenó o desarrolló dichos conflictos en la reacción de histerismo manifestada en la parálisis orgánica que incapacitaba al obrero para el trabajo. A los efectos del derecho aplicable, como veremos más adelante tales trastornos emocionales podían haber preexistido; o pudieron originarse con el accidente mismo o haberse creado por primera vez con posterioridad a éste por cualquiera de las muchas y variadas razones que apuntan las autoridades médicas y en sicología sobre la materia, y no se alteraría la situación de derecho de establecerse la adecuada relación causal entre el estado de incapacidad del obrero debido a la parálisis de tipo neurótica que padecía, y el accidente del trabajo; de no tratarse de un fingimiento de la enfermedad cosa ésta que de ordinario es de fácil advertencia para el facultativo. Como sostienen las autoridades, no cuenta tanto en este respecto la causa médica y sicológica de la reacción de histerismo que se manifiesta en trastornos físicos, como la relación causal entre dicha reacción neurótica y el accidente ocurrido.[1] Al referirnos al accidente no nos limitamos al golpe en sí

---

[1] Los Dres. A. H. Maslow y Béla Mittelmann, en su obra *Principles of Abnormal Psycology*, ed. rev. 1951 (Biblioteca Colegio de Ciencias Sociales U.P.R.) exponen, págs. 439–443, que la expresión "histerismo de conversión" ("*conversion hysteria*") fue acuñada por Freud para expresar la idea de que en situaciones de conflictos y de tensión en lugar de tener un síntoma puramente "*sicológico*" el paciente presenta un cambio observable en una función orgánica. En otras palabras, exponen ellos, que el conflicto "sicológico" es convertido a un trastorno corporal. Que el porqué esto es más corriente en algunos individuos que en otros, dicen dichos autores, es un problema sin resolver.

recibido, sino al evento que ocurrió con todas las demas circunstancias y hechos que le rodearon.

Independientemente de lo relativo al factor de causa desde el punto de vista médico, la prueba médica en el récord debidamente apreciada tampoco sostiene la conclusión de la recurrida al efecto de que la reacción de conversión diagnosticada al obrero por el siquiatra—la parálisis orgánica de tipo sicológica que lo incapacitaba—no tuviera relación causal con el accidente del trabajo. El Dr. Cordero concluyó que el obrero mostraba francas *alteraciones* sico-funcionales implantadas en una *experiencia traumática*. Por otro lado, creemos entender bien al Dr. Flores Gallardo cuando expresó que el golpe (traumatismo en la pierna) no originó el histerismo. Como una condición sicológica y emocional que es, el golpe no originaba esta neurosis a la manera en que un severo golpe en la región craneana, o contra golpe, originaría un deterioro mental de la función intelectiva, o del raciocinio, por la repercusión del traumatismo en el órgano cerebral. Al decir que el golpe no fue la causa de la reacción de conversión el Dr. Flores Gallardo explicó con claridad que la causa era sicológica o emocional y que a eso era que él se refería en sentido médico y del siquiatra, al conflicto interno. Por causa, no se estaba refiriendo al concepto causal de relación. Más claro, declaró que la reacción de conversión, clínicamente, como la conocían los médicos, surgió después del trauma. ▆▆▆▆

La incapacidad que producen las neurosis post-traumáticas desencadenadas por un accidente o sobrevenidas después de éste relacionadas con el mismo puede ser compensable, aún en aquellas ocasiones en que en el accidente no se sufra traumatismo corporal, o la lesión física resulte ser de menor importancia o de fácil curación. Bajo el término lesión se han incluído enfermedades como las neurosis traumáticas y las parálisis histéricas. El Profesor Larson expone que ya ha quedado uniformemente establecido que

cuando ha habido un accidente corporal o un traumatismo, y la incapacidad del reclamante se aumenta o se prolonga debido a una neurosis traumática o a una parálisis histérica, toda la incapacidad incluyendo los efectos de la neurosis es compensable. *The Law of Workmen's Compensation* (1952) Vol. 1, págs. 613-621 y casos recopilados; Sup. Acum. (1960) págs. 216-223. Horovitz, en su libro *Injury and Death under Workmen's Compensation Laws* (1944) dice que las neurosis traumáticas que siguen a lesiones corporales casi universalmente son compensadas aún cuando intervengan otras preocupaciones. En parecido sentido: Schneider's *Workmen's Compensation* y los casos que comenta, Vol. 5 (ed. per. 1946) págs. 241-259, y casos posteriores en Vol. Supl. III (1959) pág. 45:—Que la neurosis, la sico-neurosis y la conversión histérica son muy verdaderas y pueden resultar de accidentes industriales ha quedado definitivamente establecido, y cuando resultan de un accidente son compensables aunque existan otras preocupaciones que contribuyan, y aún cuando la lesión física sea trivial, o no exista siquiera. —Véase también lo que dicen Guttmacher y Weihofen en su obra *Psychiatry and the Law* (1952), Sico-neurosis, págs. 49-55; y el Dr. Davidson, *Forensic Psychiatry* (1952) págs. 55-63; Otto Fenichel, *The Psychoanalitic Theory of Neurosis* (1945) *Traumatic Neuroses*, págs. 117-128, (Biblioteca Colegio Ciencias Sociales).

Bajo un estatuto de compensación a obreros que definía "lesión" o "lesión personal" como el daño o perjuicio "a la *estructura física del cuerpo*", la Corte Suprema de Tejas en *Bailey* v. *American General Ins. Co.* (1955) 279 S.W. 2d 315, concedió compensación por incapacidad debido a una neurosis como resultado de un accidente. El obrero y un compañero trabajaban en un andamio suspendido a la altura de un octavo piso que se soltó del extremo en que estaba el compañero y el obrero lo vio caer y matarse. El no cayó y sólo sufrió una magulladura en la pierna que curó pronta-

mente y no causó ninguna incapacidad. Alegó que el accidente le había producido una neurosis que los médicos llamaron "reacción de ansiedad" o "estado de ansiedad". Dijo la Corte Suprema de ese Estado que el término "estructura física del cuerpo" se refería al cuerpo como un todo, a la integración perfecta y de interdependencia de los órganos que funcionan en conjunto por medio de procesos eléctricos, químicos y mecánicos como un ser que respira y vive, y no significaba meramente tal o cual sistema del organismo. Se compensó la incapacidad creada por esa neurosis aun cuando el golpe en sí, como dijimos, fue insignificante. (²) Véanse: otros casos recopilados en la nota y comentarios a esta decisión en 34 Texas Law Review, pág. 496; *Hood v. Texas Indemnity Insurance Co.* (Tex. 1948) 209 S.W.2d 345; *Roberts v. Dredge Fund* (Idaho 1951) 232 P.2d 975; *Peavy v. Mansfield Hardwood Lumber Co.* (La. 1949) 40 So.2d 505 en donde la Corte concedió compensación por una incapacidad de tipo histérica sin lesión física bajo un estatuto aun más restrictivo que definía lesión como el daño *mediante violencia* a la estructura física del cuerpo. *Charon's Case* (Mass. 1947) 75 N.E.2d 511; *In Re Hunnerwell* (Mass. (1915) 107 N.E. 934; *Burlington Mills Corp. v. Hagood* (Va. 1941) 13 S.E.2d 291; la ilustrativa opinión en *Miller v. United States Fidelity and Guaranty Co.* (La. 1957) 99 So.2d 511; *Rialto Lead & Zinc Co. v. State Industrial Comm.* (Okl. 1925) 240 P. 96; *Redfern v. Sparks-Withington Co.* (Mich. 1958) 91 N.W.2d 516; *Skelly v. Sunshine Mining Co.* (Idaho 1941) 109 P.2d 622; *O'Neil v. Industrial Accident Fund* (Mont. 1938) 81 P.2d 688; *American Smelting & R. Co. v. Industrial Commission* (Ariz. 1942) 123 P.2d 163. ■

(²) El obrero manifestó al siquiatra haberse salvado "de milagro" y que días antes un americano se había matado por esa escala. Aunque quedó suspendido en un travesaño de la escala, pudo temer que caería hasta abajo desde la altura de 25 pies. No sabemos qué efecto emocional esto pudo causarle.

El caso de *Murray* v. *Industrial Commission* (Ariz. 1960) 349 P.2d 627 presenta una trayectoria y circunstancias de un notable parecido a las del caso de autos. Después de un accidente del trabajo y el consiguiente tratamiento del traumatismo, el obrero presentaba una reacción de conversión histérica que lo incapacitaba . La Comisión concedió un 15% por incapacidad funcional. Dijo la Corte Suprema de Arizona:

"En sus conclusiones, la Comisión fijó este por ciento, e igualmente adoptó la conclusión médica de que no existía conexión causal entre la lesión y la condición mental. Bajo estas circunstancias no creemos que la Comisión intentó incluir la incapacidad por el histerismo en su determinación de incapacidad de 15%.

. . . . . . . . . . .

"Consideramos ahora la principal contienda que presenta esta apelación, a saber, si la siconeurosis del peticionario se produjo o se agravó por la lesión que tuvo como resultado del accidente, y de serlo, si tenía derecho a beneficios bajo la Ley de Compensaciones a Obreros. En substancia, el peticionario sostiene que la ley es que cuando ha habido un accidente de trabajo que causa lesión física, compensable . . . y como resultado de esa lesión el obrero desarrolla una sico-neurosis que inhabilita, y cuando el historial médico y las determinaciones médicas (a distinción de las opiniones o conclusiones médicas) demuestran que la lesión fue causa próxima de tal incapacidad, la Comisión debería tomar en consideración la enfermedad mental así como la lesión física, al hacer la adjudicación.

"Por otra parte, arguye la Comisión que la cuestión de relación causal entre la lesión y la incapacidad es peculiar y necesariamente del singular conocimiento de los peritos médicos, y que sus opiniones unánimes y no contradichas con respecto a la causalidad deben ser aceptadas por la Comisión; que la neurosis del peticionario no es compensable porque aunque era el resultado de circunstancias que surgieron de y siguieron al accidente, no se produjo o agravó por la lesión sufrida." ▬

Después de reproducir parte del testimonio médico, en donde se exponen criterios coincidentes y muy parecidos con la prueba médica en el caso ante nos, la Corte Suprema llegó

a la conclusión que (1) el accidente con la lesión resultante desempeñó un papel en establecer una ilación que produjo el resultado final de incapacidad mental. El accidente fue el primer evento en una larga sucesión de cosas que le ocurrieron a la personalidad que terminó en el histerismo; (2) que si la lesión no hubiera ocurrido, las manifestaciones neuróticas no estarían presentes; (3) había definitivamente una conexión entre la lesión de la espalda y el histerismo. La enfermedad "tomaba su colorido" del accidente; (4) el peticionario no padecía de histerismo o incapacidad siquiátrica antes del accidente y no había evidencia que la neurosis del peticionario se hubiera precipitado por algún evento en su vida que no fuera el accidente; y (5) el estímulo externo del accidente y la lesión, sobre la personalidad particular de que el peticionario estaba dotado fue el evento que comenzó o puso de relieve el proceso mediante el cual esa personalidad desarrolló el histerismo. Añadió la Corte:

"En opinión de los doctores esta lesión no 'causó' el histerismo desde el punto de vista médico. Sin embargo, lo que constituye causa próxima es primordialmente una cuestión legal, que depende para su contestación de los hechos del caso en particular. En el campo de la medicina, las opiniones de médicos cualificados por el adiestramiento y la experiencia en cuanto a causalidad son adecuadas, y en muchos casos predominantes y decisivas para el juzgador de los hechos, sin embargo, cuando los hechos médicos en que se basan tales opiniones aparecen claramente, y la opinión médica en cuanto a causalidad está en conflicto con la inevitable conclusión legal, la primera debe dar paso a la segunda. La diferencia entre el concepto médico y el legal de la causa surge de la diferencia obvia entre los problemas y exigencias básicos de las dos profesiones en relación a causalidad. Por razón de su adiestramiento el médico está pensando en términos de una única causa precisa para una determinada condición. La ley, sin embargo, trata de llegar a la inferencia de una razonable certeza médica, dado un determinado evento o sucesión de eventos, y reconoce más de una causa para un resultado perjudicial... De igual manera, en el campo de la compensación a obreros el patrono toma a su empleado como

él es. En sentido legal, si una lesión que opera sobre una condición o predisposición corporal existente produce un resultado perjudicial más amplio, ese resultado es causado por la lesión."

El Dr. Vázquez Milán, expresando que en casos de un traumatismo como el diagnosticado a este obrero con una sintomatología que se mezclara con el aspecto sico-funcional de la condición que él presentaba, era difícil llegar a una conclusión categórica de hasta qué punto pudo directa o indirectamente estar relacionada con el accidente, trazó con acierto la pauta apropiada al indicar que ante una situación así, quedaba para la Comisión el resolver si la prueba médica señalaba una condición histérica de conversión que pudiera mezclarse con la condición orgánica como la diagnosticada. Aparentemente, la recurrida no evaluó esa situación. ▆▆▆

En este campo de la adjudicación administrativa, más que en otro alguno, se requiere de la ciencia médica para la disposición legal de los derechos de las partes. Pero en la función cuasi-judicial que se ejerce administrativamente, así como en la judicial después, han de pesarse conjuntamente con los elementos de juicio científicos que ofrece la prueba pericial, todos los demás hechos y circunstancias que ofrezcan otros elementos de juicio, y con todos ellos llegar a aquel balance racional de la situación a la luz de las normas de ley aplicables, para la adjudicación de los derechos envueltos. La función de adjudicación de los organismos administrativos en este campo no está limitada a optar por una conclusión médica, o por aquella que se prefiera cuando existe honesta discrepancia de criterio facultativo. Aparte de que hasta cierto punto ello podría tener involuntariamente el efecto de delegar la función judicial de adjudicación en los peritos, hay que tomar en cuenta que en torno al importante y decisivo factor de causalidad entre la lesión o la enfermedad que incapacita y el accidente de trabajo existe, por imperativo de las propias disciplinas, fundamental diferen-

cia entre el concepto de la causa desde el punto de vista médico y desde el punto de vista legal. (³) ▪

En esta función de aplicar la Ley de Compensaciones a Obreros no hay que repetir ni sostener con autoridades lo que constituye el arraigado principio de que leyes de esta naturaleza, por ser remediadoras, han de interpretarse liberalmente en favor de aquellos a quienes intentan proteger, o como se dijo en *Spina* v. *Gahagan Construction Corp.* (Pa. 1957) 135 A.2d 760, para que se cumplan sus amplios propósitos humanitarios. En particular, nuestra propia Ley de Compensaciones por Accidentes del Trabajo aplicable a los obreros que sufren lesiones *o se inutilizan* o pierden la vida por accidentes que provengan de cualquier acto o función inherente al trabajo ocurrido en el curso de éste, adoptó por mandato legislativo expreso el principio no discutible en la doctrina, y dispuso que la ley se interpretaría liberalmente, y que cualquier duda razonable que en su aplicación surgiere en cuanto a la existencia de *relación causal* entre el trabajo u ocupación del obrero o empleado y la lesión, incapacidad o muerte, o el carácter ocupacional de una enfermedad, *deberá resolverse a favor* del obrero o empleado, o sus beneficiarios. Art. 2 de la Ley 45 de 1935, según fue enmendado por la Ley 94 de 22 de junio de 1957. Esta disposición envuelve un reconocimiento del Legislador para guía de los organismos administrativos que intervienen, de que no siempre puede ser factible, sobre todo si hay criterios médicos no coincidentes, el probar bajo la Ley un derecho

---

(³) Véanse autores citados, y: Ben F. Small, *Gaffing at a thing called cause: Medico-Legal Conflicts in the Concept of Causation,* (artículo, 1953) 31 Texas Law Review, págs. 631–659; Kessler, *Accidental Injuries —The Medico-Legal Aspects of Workmen's Compensation and Public Liability* (1941) págs. 605–619; *Medical Trial Technique Quarterly* (1958 Annual) págs. 253–265; Hubert W. Smith, *Scientific Proof and Relations of Law and Medicines* (artículo) 23 Boston Law Review, pág. 143; *Traumatic Neuroses in Court,* 30 Virginia Law Review, pags. 87, 138–159; Albert Averbach, *Handling Accident Cases. Causation: A Medico-Legal Battlefield* (1958) págs. 555–581.

a compensación de manera absoluta o sin lugar a duda alguna, y que existen áreas de dudas razonables que no deben derrotar los propósitos remediadores de la ley ni el derecho a compensación.

No es la misión nuestra, ni tendríamos el conocimiento requerido para ello, el fijar con certeza la causa exacta del conflicto interno o emocional que con el accidente desarrolló en este caso el histerismo de conversión, dentro de los muchos criterios médicos que podrían ser aplicables. Eso queda para los facultativos. (4)

Resolvemos que el estado de incapacidad del obrero para trabajar producido por esta reacción psico-neurótica es compensable a la luz de la prueba y de las autoridades citadas. Al devolverse el caso la Comisión fijará la compensación según el prognóstico en el récord a la fecha en que se desestimó la reclamación, o podrá, por tratarse de un trastorno sicológico, disponer una nueva evaluación médica al presente, y fijar la compensación que proceda.

*La resolución recurrida será anulada.*

---

(4) Véanse, autores citados. *Insurance Counsel Journal,* (enero 1958) Cecil G. Baker, *Traumatic Neuroses;* Curran, *Law and Medicine* (1960) Cap. *An Anatomy of Trauma. Psychiatric Aspects of Trauma,* págs. 201–289; *Lawyer's Medical Encyclopedia* (1959) Vol. III, págs 139–174; Vol. IV, *Traumatic psychoneurosis,* págs. 387–394.

Entre las causas reconocidas está el llamado histerismo debido a una ansiedad o tensión por razón de la compensación o beneficios a que el obrero cree tiene derecho. La incapacidad que este tipo de histerismo produce se ha considerado compensable, de ser real e inconsciente para el obrero. El Dr. Vázquez Milán aparentemente sospechaba un caso así al recomendar una compensación mínima como medio de rehabilitación. No insinuamos siquiera que ese sea este caso, y por otra parte, el récord no destaca aquellos signos que en opinión de las autoridades serían característicos de un tipo así de histerismo.