VICTORIA REYES VDA. DE MORALES y CARLOS MORALES MERCED (occiso), apelantes, *v.* POLICÍA DE PUERTO RICO y CORPORACIÓN DEL FONDO DEL SEGURO DEL ESTADO, apelados.

*Número:* AA-95-54          *Resuelto:* 23 de diciembre de 1996

*Carlos Ortiz Santiago*, abogado de la parte apelante; *Antonio Vidal*, abogado de la Corporación del Fondo del Seguro del Estado, parte apelada.

PER CURIAM: Carlos Morales Merced se desempeñó como policía durante diecisiete (17) años. En sus últimos años de servicio trabajó como investigador de la División de Vehículos Hurtados. El 9 de noviembre de 1989, en horas de la mañana, fue asignado a investigar el hurto de un vehículo junto al Agente Ángel Feliciano Torres. En virtud de una

comunicación sobre su localización, encontraron el vehículo en un área de difícil acceso, por lo que decidieron empujarlo para sacarlo a la carretera. Empezaron a empujar, pero Morales Merced le indicó a su compañero que *no podía continuar porque se sentía mal.* Solicitaron la ayuda de una grúa y, luego de llegar ésta, ambos agentes regresaron a su oficina, entre las 12:00 y las 12:15 P.M.

A la 1:00 P.M. Morales Merced salió de su oficina acompañado del Agente Ramón Rodríguez León. Mientras se encontraban en la calle, recibieron una llamada relacionada con otro vehículo hurtado que estaba quemándose. Ya en el lugar, Morales Merced ayudó al gruero a cargar unas cadenas. *Rodríguez León notó que Morales Merced sudaba mucho.* Luego de que el vehículo fuera enganchado a la grúa, ambos agentes se dirigieron a la residencia del dueño del automóvil. En el trayecto, Morales Merced le manifestó a su compañero que *se sentía agitado, con el pecho apretado y que la cabeza le quería estallar.* Le dijo, además, *que se había sentido mal durante el día y quería regresar a la oficina para ver si su supervisor le permitía irse a su casa.*

Una vez en la oficina, Morales Merced le indicó a su supervisor, Félix Ríos González, *que le dolía el pecho y tenía una mano adormecida.* Le solicitó y obtuvo el permiso para marcharse. Al llegar a su casa, Morales Merced le comunicó a su esposa, Victoria Reyes, *que se había sentido mal mientras estaba recuperando unos autos robados que había en un barranco y que iría al Fondo del Seguro del Estado* (en adelante el Fondo) *al otro día.* Luego comió y se recostó a ver televisión; aún así, le decía a su esposa que se sentía mal.

Al día siguiente, como a las 5:00 A.M., mientras Morales Merced se preparaba para ir al Fondo, su esposa notó *que su boca estaba virada.* Lo llevó al Hospital San Cristóbal de Ponce, donde permaneció de dos (2) a tres (3) horas en la Sala de Emergencia. Un médico le dijo que la presión de su esposo *estaba muy alta y debía ser transferido al Hospital*

*Dr. Pila.* Una vez en ese hospital, la señora Reyes se percató de que su esposo había perdido el conocimiento y sangraba por la boca, la nariz y los oídos. Morales permaneció en dicho hospital hasta que falleció el 12 de noviembre de 1989. De acuerdo con su certificado de defunción, la causa fue una hemorragia cerebro-vascular. Expediente administrativo, pág. 56. *No se efectuó autopsia.*

El 11 de noviembre de 1989 se sometió ante el Fondo el informe de accidente de trabajo. El 29 de enero de 1990 el Administrador del Fondo ordenó el cierre y archivo del caso fundamentado en el informe médico del doctor Rivera Olivieri. Este concluyó que la muerte del Agente Morales Merced no fue como consecuencia del trabajo, ya que no había historial de trauma físico ni psíquico, ni esfuerzo extraordinario alguno.

Oportunamente, la señora Reyes Vda. de Morales apeló a la Comisión Industrial (en adelante la Comisión). El 3 de abril de 1992 se celebró la correspondiente vista pública, la cual finalizó el 28 de octubre de 1994. El Oficial Examinador recomendó *confirmar.* El 13 de marzo de 1995 la Comisión adoptó totalmente el informe y ordenó el cierre y archivo del caso. Inconforme, acudió ante nos la señora Reyes Vda. de Morales.[1]

En síntesis, la señora Reyes Vda. de Morales plantea que la conclusión de la Comisión no está sostenida por la prueba y que ésta actuó parcializadamente; además, de que esa determinación se apoyó en la opinión de la doctora Sterling, la cual fue producto de la especulación y la conjetura, sin tener ante ella un informe de autopsia. Veamos.

---

[1] Nos hace los señalamientos de error siguientes:

"1. La conclusión y resolución de la CI es contraria a derecho y no está sostenida por la prueba que tuvo ante su consideración.

"2. Erró la CI al resolver el presente caso apoyada en la opinión de la Dra. Sterling, quien es Patóloga y no tuvo ante sí un informe de autopsia por no habérsele practicado al occiso Carlos Morales Merced y cuya opinión fue producto de la especulación y conjetura.

"3. Erró la CI al tratar el presente caso, desde el principio al fin, con prejuicio en contra de la parte apelante y parcialidad a favor de la parte apelada." Apelación, págs. 5–6.

## II

El Art. 2 de la Ley del Sistema de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 2,[2] establece que quedan cubiertos bajo sus disposiciones todos los obreros o empleados que: (1) sufran lesiones o se inutilicen o que pierdan la vida por accidentes que provengan de cualquier acto o función inherente a su trabajo o empleo; (2) que ocurran en el curso de éste, y (3) como consecuencia de él. *Pacheco Pietri y otros v. E.L.A. y otros*, 133 D.P.R. 907 (1993); *Díaz Ortiz v. F.S.E.*, 126 D.P.R. 32 (1990); *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985); *Admor., F.S.E. v. Comisión Industrial*, 101 D.P.R. 56 (1973); *Cardona v. Comisión Industrial*, 53 D.P.R. 197 (1938). El incumplimiento de alguno de estos requisitos excluye la reclamación del ámbito de esta ley. Deberá existir un nexo o una relación causal entre la lesión o enfermedad del obrero y su trabajo. *Pacheco Pietri v. E.L.A.*, supra.

Ahora, reiteradamente hemos expresado que una condición preexistente es compensable cuando dicha condición se agrava o se acelera como resultado de las labores realizadas en su empleo. *Morell v. F.S.E.*, 110 D.P.R. 709 (1981); *Díaz Ortiz v. F.S.E.*, supra. Por otro lado, hemos establecido que la función del organismo administrativo, y la de este Tribunal, "no consiste en determinar el origen etiológico de la enfermedad sino que debe limitarse a determinar la existencia de una relación de causalidad entre la labor realizada y el resultado final —incapacidad o muerte—, o sea, *si la labor contribuyó al resultado, mediante la agravación, aceleración o precipitación de la enfermedad*". (Énfasis suplido.) *Vda. de Fernádez v. Comisión Industrial*, 85 D.P.R. 298, 301 (1962). Véanse: *Rivera Rivera v. Comisión Industrial*, 100 D.P.R. 658, 661 (1972);

---

[2] Ley Núm. 45 de 18 de abril de 1935, según enmendada, 11 L.P.R.A. sec. 1 *et seq.*

*Ortiz Candelario v. Comisión Industrial*, 90 D.P.R. 387, 407 (1964); *Feliciano Figueroa v. Comisión Industrial*, 84 D.P.R. 196 (1961).

En cuanto a los casos en que el obrero padezca de una condición cardíaca preexistente, en el pasado hemos resuelto que para que el accidente sea compensable es menester que el esfuerzo realizado por el obrero haya sido extraordinario o inusitado. Véanse: *Trigo & Hnos. v. Comisión Industrial*, 80 D.P.R. 520 (1958); *Antongiorgi v. Comisión Industrial*, 80 D.P.R. 512 (1958); *Rivera v. Comisión Industrial*, 79 D.P.R. 386 (1956); *Cordero v. Comisión Industrial*, 68 D.P.R. 127 (1948). Sin embargo, en *Vda. de Fernández v. Comisión Industrial*, supra, págs. 301–302, revocamos expresamente las opiniones de este Tribunal en cuanto al requisito de "esfuerzo extraordinario" para que el accidente fuese compensable. Allí expresamos "que el grado de esfuerzo no es el criterio para determinar la compensabilidad, sino la existencia de relación causal entre la incapacidad o muerte y algún incidente en el trabajo [y] que deben examinarse todas las circunstancias inmediatas para resolver si ocurrió un accidente que agravó, aceleró o precipitó el resultado final por el cual se reclama". *Vda. de Fernández v. Comisión Industrial*, supra, pág. 305.

Por otro lado, el Art. 2 de la Ley del Sistema de Compensaciones por Accidentes del Trabajo, *supra*, dispone, en lo pertinente, que "cualquier duda razonable que en su aplicación surgiere en cuanto a la existencia de relación causal entre el trabajo u ocupación del obrero o empleado y la lesión, incapacidad o muerte, o el carácter ocupacional de una enfermedad, deberá resolverse a favor del obrero o empleado, o sus beneficiarios". El concepto "duda razonable" requiere que, luego de que el juzgador haga la evaluación de los hechos, las circunstancias y todos los elementos de juicio, entre los cuales se encuentra la "sucesión de eventos y el sentido común", no exista en el expediente prueba alguna que demuestre "de manera convincente y

sin lugar a dudas", que no existe una relación de causalidad entre el trabajo del obrero y su incapacidad o muerte. *Ortiz Candelario v. Comisión Industrial,* supra, pág. 407.

## III

A la luz de esta normativa, analicemos la prueba que tuvo ante sí la Comisión. La prueba testifical presentada por la apelante, la señora Reyes Vda. de Morales, estableció que durante la mañana de 9 de noviembre Morales Merced y el Agente Feliciano Torres decidieron empujar un automóvil hurtado que se encontraba atascado en un cañaveral. Mientras empujaba, Morales Merced comenzó a sentirse mal, a tal grado que no pudo continuar dicha labor.[3]

Como a la 1:00 P.M., Morales Merced fue a recoger otro automóvil hurtado. Esta vez, mientras ayudaba a un gruero a cargar unas cadenas para enganchar el automóvil, su compañero, el Agente Rodríguez León, notó que éste estaba sudando mucho. Morales Merced le manifestó que se sentía agitado, con el pecho apretado y que la cabeza le quería estallar. Rodríguez León declaró que durante la mencionada labor, Morales Merced se quejaba de dolores de cabeza y se sentía agitado.[4]

El Agente Ríos González, supervisor de Morales Merced, describió el trabajo que se realiza en la División de Vehículos Hurtados como "agitado", en el que los agentes se mantienen "activos". *Declaró que Morales Merced se había reportado dos (2) o tres (3) veces al Fondo al sentir dolores en el pecho.* Sobre el 9 de noviembre, relató que a las 3:00 P.M., éste se personó a sus oficinas para indicarle que le dolía el pecho y que tenía las manos adormecidas. Declaró, además, que ese día Morales Merced había trabajado "fuer-

---

[3] Declaración del Agente Feliciano Torres, Expediente administrativo, pág. 38.
[4] Declaración del Agente Rodríguez León, Expediente administrativo, págs. 36–37.

te" porque tuvo que recuperar dos (2) autos. Finalmente, el testigo le preguntó a Morales Merced si quería que lo llevara al hospital, debido a que sabía que padecía de problemas del corazón. Éste le contestó que prefería irse a su casa a descansar.[5]

La peticionaria, Reyes Vda. de Morales, declaró que, según su esposo, el trabajo que éste desempeñaba era difícil y que regularmente se quejaba de las tensiones que éste producía. Testificó que su esposo padecía de constantes dolores en el pecho y en consecuencia tuvo que reportarse, al menos en tres (3) ocasiones, al Fondo. Morales Merced alegaba que estos dolores eran consecuencia de las tensiones producto del trabajo. Reyes Vda. de Morales describió a su esposo como una persona delgada, de cuarenta y seis (46) años y fumador moderado.

El 9 de noviembre, su esposo llegó a la casa más temprano que de costumbre. Le dijo que se había sentido mal en el trabajo, mientras estaba recuperando unos autos robados. Luego comió y se recostó, pero aún sentía malestar. Al otro día por la mañana se percató de que la boca de su esposo estaba virada y lo llevó al hospital, donde murió dos (2) días más tarde.[6]

Surge del testimonio prestado por la Dra. Teresa Sterling,[7] perito consultor de la Comisión,[8] que según los expedientes médicos de Morales Merced, éste padecía de hipertensión y tomaba medicamentos para controlar su presión. Declaró que el 9 de noviembre Morales Merced sufrió fuertes dolores de cabeza y en el lado izquierdo del pecho mientras desempeñaba funciones inherentes a su cargo. No obstante, declaró que ese día no recibió ningún

---

[5] Declaración del Agente Ríos González, Expediente administrativo, págs. 38–41.

[6] Declaración de la señora Reyes Vda. de Morales, Expediente administrativo, págs. 41–42.

[7] Declaración de la doctora Sterling, Expediente Administrativo, págs. 32–36.

[8] Se desprende del expediente administrativo que ni el Fondo del Seguro del Estado ni la parte peticionaria presentaron prueba pericial alguna a su favor.

trauma, ni físico ni psíquico. Alegó que su condición de salud se agravó, fue hospitalizado y falleció luego. Según el acta de defunción, la causa de la muerte fue una hemorragia cerebro-vascular.

Conforme a la doctora Sterling, los dos (2) posibles eventos que pudieron provocar la hemorragia fueron la rotura de un aneurisma o que la hemorragia fuera a causa de la hipertensión. Concluyó que ninguna de las dos (2) causas puede ser descartada, debido a que no se hizo una autopsia, pero entiende que debido a su hipertensión arterial, la causa de la muerte pudo haber sido una hemorragia parenquimatosa provocada por dicha condición.

Sin embargo, declaró que no existe evidencia alguna en su historial laboral que permita concluir que las labores realizadas el 9 de noviembre por Morales Merced precipitaron una crisis. Alegó que un paciente hipertenso puede sufrir una hemorragia en cualquier momento si no tiene su presión bien controlada. A base de lo anterior, concluyó que la muerte no estuvo relacionada con el trabajo, sino con su condición.

A preguntas de la representación jurídica de la peticionaria, la doctora Sterling descartó que las gestiones realizadas por Morales Merced el día de su muerte provocaron el derrame cerebral. Concluyó que el derrame no pudo ocurrir mientras empujaba el vehículo, porque se hubiese puesto comatoso en ese mismo instante. *Sin embargo, declaró que un síntoma de dolor de cabeza fuerte y alta presión puede desencadenar en un derrame cerebral al otro día o dos (2) o tres (3) días después.* Testificó que era posible que durante ese día (9 de noviembre) hubiese tenido la presión alta, pero la hemorragia cerebral le dio al otro día, mientras no estaba realizando esfuerzo.

*Añadió que la hipertensión arterial de Morales Merced podría desencadenar en un "ataque cerebral". Además declaró que su presión arterial podría precipitar un derrame cerebral. Aclaró que a una persona le puede subir la pre-*

*sión al realizar un esfuerzo, o mientras trabaja, pero que al estar en reposo, ésta le baja.* En cuanto a Morales Merced, declaró que éste estuvo en reposo al menos doce (12) horas después de realizar el esfuerzo. *No descarta que le hubiese subido la presión con el esfuerzo realizado el 9 de noviembre, pero que la hemorragia se desarrolló al otro día.* Argumenta que la hemorragia no le pudo sobrevenir en el momento en que empujaba el vehículo porque no se desmayó y no tuvo síntomas de paraplejia en el mismo momento.

## IV

*No hay duda de que Morales Merced padecía de hipertensión arterial hacía ya algún tiempo.* Pero al enfrentarnos con la cadena de eventos que tuvieron lugar el 9 de noviembre, la totalidad de la prueba nos permite concluir, de forma lógica y racional, que existió gran probabilidad de que el esfuerzo físico efectuado por Morales Merced, mientras realizaba labores inherentes a su trabajo, aumentara su presión arterial y provocara, así un derrame cerebral un (1) día después.

*La prueba pericial no descartó esta posibilidad.* El testimonio de la doctora Sterling estableció que un aumento en la presión de Morales Merced pudo precipitar el derrame cerebral y que éste pudo ocurrir varios días después. Más aun, ésta declaró que sus labores y gestiones realizadas durante el 9 de noviembre pudieron aumentar su presión. Es determinante para nuestro análisis que, con anterioridad al esfuerzo realizado mientras empujaba un auto hurtado, Morales Merced no presentara síntoma alguno relacionado con su presión arterial; es con posterioridad al mencionado evento que la salud de éste comienza a deteriorarse y, posteriormente, muere.

Ante este cuadro fáctico no puede concluirse, de manera categórica y sin lugar a dudas, que los esfuerzos físicos realizados por Morales Merced no aumentaron su presión

arterial y provocaron así el derrame cerebral que terminó con su vida. La prueba presentada ante la Comisión no demostró de forma clara y absoluta, y bajo toda apreciación posible de los hechos, la inexistencia de causalidad entre el trabajo realizado por el obrero y la precipitación de un derrame cerebral. *Ortiz Candelario v. Comisión Industrial*, supra, pág. 406.

Es menester señalar que si bien es necesario establecer una relación causal, ella no tiene que estar fundamentada imprescindiblemente en un testimonio médico. La "sucesión de eventos" del caso de autos es suficiente para establecer que el derrame cerebral pudo ser provocado por las labores realizadas por Morales Merced. Ello crea un estado de "duda razonable" que favorece al obrero, según lo dispuesto en el Art. 2 de la Ley del Sistema de Compensaciones por Accidentes del Trabajo, *supra*.

Por los fundamentos antes expuestos, *se dictará la sentencia correspondiente.*

El Juez Presidente Señor Andréu García y el Juez Asociado Señor Fuster Berlingeri concurrieron con el resultado sin opinión escrita.